**Amanda DODD–ANDERSON, a minor By and Through Krystal L. DODD–ANDERSON, her mother, natural guardian, and next friend, and Krystal L. Dodd–Anderson, individually, Plaintiffs,**

v.

**Mildred J. STEVENS, M.D., Anderson County Hospital, and David V. Henderson, M.D., Defendants.**

**Nos. 92–1015–MLB, 92–1016–MLB.**

United States District Court,
D. Kansas.

Oct. 31, 1995.

---

Mark B. Hutton, Hutton & Hutton, Wichita, KS, Randall E. Fisher, Wichita, KS, for Amanda Dodd–Anderson, in No. 92–1015–MLB.

Anne H. Pankratz, Mark B. Hutton, Hutton & Hutton, Wichita, KS, Randall E. Fisher, Wichita, KS, for Krystal L. Dodd, in No. 92–1015–MLB.

Eldon L. Boisseau, Brian C. Wright, Turner & Boisseau, Chartered, Great Bend, KS, for Mildred J. Stevens, M.D., in No. 92–1015–MLB.

Randy J. Troutt, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, for David V. Henderson, M.D., in No. 92–1015–MLB.

Roger W. Warren, David R. Erickson, Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, KS, for Anderson County Hosp., in No. 92–1015–MLB.

Mark B. Hutton, Hutton & Hutton, Wichita, KS, for Amanda Dodd–Anderson, Krystal L. Dodd, in No. 92–1016–MLB.

David R. Erickson, Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, KS, for Anderson County Hospital, in No. 92–1016–MLB.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on defendant David Henderson's motion for summary judgment. (Doc. 236.) Plaintiffs have responded and the court is prepared to rule.

### Material Facts

Mildred Stevens was a doctor at Anderson County Hospital in Garnett, Kansas. Her clinical privileges have since been revoked. Stevens gave Krystal Dodd–Anderson ("plaintiff") prenatal care and delivered Amanda, plaintiff's daughter, on May 19, 1991. Stevens did not use the hospital's fetal heart monitor during delivery and did not know how to use one. (Doc. 248, Uncontroverted Fact at ¶ 1.) Two minutes after delivery, Amanda was severely respiratorily depressed. The respiratory therapist on the

case made a request that Stevens order Amanda's transfer to a facility able to keep a child on mechanical or manual ventilation, (Doc. 248, Ex. A at 28), which Stevens denied. (Doc. 248, Ex. I at 68.) Concerned about the denial to transfer, the respiratory therapist paged David Henderson ("defendant"), another doctor from Anderson County Hospital and the director of the respiratory therapy department. The respiratory therapist spoke to defendant on the telephone when he returned the page:

Q. What do you recall exactly you said to him? Give me a recount of your best memory what was said by you and what was his response.

A. Dr. Henderson, we have an OB here that delivered that is a meconium stained. It is intubated. I am bagging it. I need you here and I need you here now.

Q. What did he say?

A. I don't know. I hung up on him.

(Doc. 248, Ex. A at 40.)

When defendant arrived at the hospital, he observed Amanda from about two to three feet. (Doc. 237, Henderson Dep. at 71.) He noted that Amanda had "fairly good color," was receiving oxygen, had some movement in her extremities, and was making a "squeaking noise." (Doc. 237, Uncontroverted Fact at ¶ 4.) Defendant was given Amanda's vital signs and Apgar scores,[1] which defendant recognized as "not good." (Doc. 237, Henderson Dep. at 71–72.) Defendant then discussed the matter with Stevens in the hallway:

A. I did go to the hospital, and I had a discussion with Dr. Stevens in regard to the care of the patient. We discussed what had happened post delivery, and her discussion with me led me to believe that she was trying to manage the case in an appropriate manner, and that she would continue to manage the case, and that she really didn't desire my consultation or cer-

---

1. An Apgar score is an evaluation of a newborn infant's physical status by assigning numerical values to the baby's heart rate, respiratory effort, muscle tone, response stimulation and skin color. Stedman's Medical Dictionary 1395 (25th ed. 1990).

tainly to manage the case, and assured me that proper steps would be taken in the management of the case, and then basically, I subsequently left the facility.

(Doc. 237, Uncontroverted Fact at ¶ 5; Henderson Dep. at 67.) [2]

Defendant testified that he did not "per se" suggest or tell Stevens to transfer Amanda during their conversation in the hallway. Stevens stated that defendant did not suggest a transfer at that time. (Doc. 237, Henderson Dep. at 70, 75; Doc. 237, Stevens Dep. at 70.) The respiratory therapist, however, testified that after his hallway discussion with Stevens, defendant told her he had recommended to transfer Amanda but that Stevens refused. (Doc. 248, Ex. A at 41.) She noted defendant's statement in her medical report. (Doc. 248, Ex. B at 3.) Defendant went back into the delivery room for another brief look at Amanda after his conversation with Stevens, then left the hospital. Defendant knew that if Amanda's condition deteriorated, the nurses would call him. (Doc. 237, Henderson Dep. at 75–76.)

The next afternoon, May 20, 1991, a nurse called defendant at his office and told him Amanda was not doing well and that she needed to be transferred. (Doc. 237, Henderson Dep. at 112–13.) Defendant went to the hospital and briefly discussed the transfer with Stevens, who decided to transfer Amanda because she was not taking fluids. Stevens testified that she and defendant "talked in the hall, and the baby wasn't taking fluids. I said I thought it would be a good idea to transfer it. He agreed." (Doc. 237, Stevens Dep. at 71.)

There is a dispute regarding whether another conversation occurred on May 20 between Stevens, Henderson, Jim Johnson [3] and Daniele Halsel [4] to determine Stevens' intent regarding Amanda's transfer. Halsel testified that she attended the meeting and she believed Stevens decided to transfer Amanda in part because of the result of recent radiological findings. (Doc. 275, Halsel Dep. at 26–27.) Defendant testified that he, Halsel and Johnson had a discussion, but no party has provided defendant's deposition excerpts regarding the details of the discussion, if any. (Henderson Dep. at 114–115.) Stevens testified that she talked with defendant in the hallway regarding Amanda's failure to take fluids. Stevens stated that "we decided it would be best to transfer" and that "I said I thought it would be a good idea to transfer. He agreed." Stevens denied any "meeting" attended by Halsel and Johnson. (Stevens Dep. at 71–72.) No deposition testimony by Johnson was provided by the parties. The respiratory therapist who had called Henderson the day before testified, "I do know that there was a meeting with Dr. Henderson, Mr. Johnson, and Dr. Stevens and Danny Halsel. And when they came out of that meeting, it was transfer the child." (Doc. 248, Ex. A at 46.)

Stevens transferred Amanda to the Kansas University Medical Center that day. Amanda was later diagnosed as having cerebral palsy.

### The Parties' Contentions

Plaintiffs filed a complaint against Stevens, Henderson and Anderson County Hospital on January 9, 1992, alleging that Amanda was injured because Stevens failed to notice problems during delivery and did not transfer Amanda to another facility immediately after delivery. Plaintiffs brought action against Anderson County Hospital for alleged COBRA violations pursuant to 42

---

2. Plaintiffs purport to controvert ¶ 5, stating, "Defendant had a physician-patient relationship with Amanda. Defendant came to the hospital for the benefit of Amanda at the request of the respiratory therapist (Plaintiffs' Fact # 13.) Defendant observed, evaluated and proposed treatment for Amanda. (Plaintiffs' Fact # 14–19.)" (Doc. 248 at 20.) This response is fairly typical of many of plaintiffs' responses and is improper. Statements of fact may not be controverted with conclusions of fact or conclusions of law. Facts responded to in such a manner have been deemed admitted. D.Kan.Rule 56.1.

3. The record indicates that Mr. Johnson was the hospital's administrator at the time and the court assumes he was the one involved in the conversation. (Doc. 248, Ex. E at 110.)

4. Daniele Halsel was the hospital's management consultant and was at the hospital on another matter when she became involved in the discussion with Stevens. (Doc. 275, Halsel Dep. at 19.)

U.S.C. § 1395dd. Plaintiffs subsequently settled with Stevens and Anderson County Hospital, (Docs. 228, 239), and only their claims. of negligence against Henderson remain. Plaintiffs allege defendant owed them a duty of due care both as their physician and as chief of staff at Anderson County Hospital: 1) Henderson was plaintiffs' physician and acted negligently in not making arrangements for Amanda's immediate transfer, (Doc. 59, Second Amended Complaint at ¶ 19);[5] 2) Henderson failed to inform plaintiffs of the limitations of Anderson County Hospital, (id. at ¶ 26); 3) Henderson, in his capacity as chief of staff, was negligent in allowing Stevens staff privileges at the hospital knowing that she was unable to use the fetal heart monitor, (id. at ¶ 19); 4) Henderson, in his capacity as chief of staff, was negligent in failing to intervene in Stevens' treatment of Amanda, (id.); and 5) that any negligence of the nurses, nurse-aids, interns, residents, student nurses and other hospital personnel is the negligence of Henderson because of his status as chief of staff, (id. at ¶ 13).[6]

Defendant has moved for summary judgment on the grounds that he did not owe plaintiffs the duty to protect them from the harms they allege. First, defendant argues that he was not plaintiffs' physician and did not have a duty to arrange Amanda's immediate transfer or to inform plaintiffs of the limitations of Anderson County Hospital. Second, defendant argues that his duties as chief of staff did not create a duty to intervene in Stevens' treatment of Amanda or to prevent Stevens from having staff privileges at the hospital.

Plaintiffs are residents of Arizona and this court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

### Summary Judgment Standards

■ Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is appropriate only if the record, viewed in the light most favorable to the nonmoving party, shows the moving party is entitled to summary judgment. *Leadville Corp. v. United States Fidelity and Guar. Co.*, 55 F.3d 537, 539 (10th Cir.1995). More than a procedural shortcut, summary judgment is an important procedure designed to secure the "just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although summary judgment is not favored in negligence cases, negligence is never presumed and plaintiffs have a duty to offer proof concerning all elements of their claims. *See Sharples v. Roberts*, 249 Kan. 286, 292, 816 P.2d 390 (1991) (citing *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555).

■ Under Kansas law, the elements necessary to establish a claim for medical malpractice are the same as those required in any negligence action. *Sharples*, 249 Kan. at 294, 816 P.2d 390. Plaintiffs must show that defendant owed them a duty, that he breached his duty and that there is a causal connection between the breached duty and the injuries sustained. *Mellies v. Nat'l Heritage, Inc.*, 6 Kan.App.2d 910, 912; 636 P.2d 215 (1981). In a malpractice action, all three elements must be established through the testimony of one or more competent expert witnesses. *Wozniak v. Lipoff*, 242 Kan. 583, 587, 750 P.2d 971 (1988).

### *Existence of a Physician–Patient Relationship*

The court first turns to whether defendant became plaintiffs' physician. The undisputed

---

**5.** Plaintiffs' Second Amended Complaint filed at Doc. 80 is identical.

**6.** Plaintiffs state in their memorandum that there is no allegation that Henderson's liability is vicarious. "The allegations relating to his status as chief of staff are purely his own negligence. *See Schmeck* [v. *City of Shawnee* ], 232 Kan. [11] at 27 [651 P.2d 585] [1982]." (Doc. 248 at 30.)

*Schmeck* provides no authority for non-vicarious liability based upon the negligence of others. By accepting his duties as chief of staff, defendant did not agree to assume liability for the negligence of other hospital employees or staff. See and compare *Oberzan v. Smith*, 254 Kan. 846, 869 P.2d 682 (1993). This claim merits no further discussion.

evidence, viewed in the light most favorable to plaintiffs, shows that defendant responded to a call regarding an apparent emergency, observed Amanda from two or three feet, reviewed her Apgar scores and vital signs, gave his medical opinion to Stevens that she should transfer Amanda, which Stevens did not follow, and then left the hospital. The following day, defendant again conferred with Stevens and agreed with her decision to transfer Amanda. At no time did Amanda's mother ever request defendant to examine or treat Amanda.

Plaintiffs have the burden to prove their claim that a physician-patient relationship existed. They recognize that no Kansas case sets forth the elements for determining the existence of a physician-patient relationship. (Doc. 248 at 24.) Plaintiffs cite two cases from other jurisdictions.

*Greenberg v. Perkins,* 845 P.2d 530 (Colo. 1993) concerned the alleged malpractice of Dr. Greenberg, who performed an independent medical examination ("IME") at the request of a third party in an unrelated personal injury action. As part of the IME, Dr. Greenberg referred the plaintiff for a functional capacity evaluation. The plaintiff then sued Dr. Greenberg, contending he was negligent in referring her for a functional capacity evaluation in light of her condition and that she suffered injuries because of the tests she had to perform during the evaluation. The district court granted summary judgment on the basis that no physician-patient relationship existed between the plaintiff and Dr. Greenberg and thus that he had no duty of care. The Colorado Court of Appeals reversed and the Supreme Court affirmed.

The court held, in substance, that even when a traditional contractual physician-patient relationship does *not* exist, a physician who undertakes to examine a non-patient owes a duty to conduct the examination in a manner not to cause harm to the person being examined. There is nothing revolutionary about this ruling; it is no more than a judicial restatement of the Hippocratic Oath.[7]

However, while the court found that Dr. Greenberg had a duty, the court also observed that "... any duty to be recognized in connection with the performance of professional services must be determined in each instance by taking into account the nature of the services to be performed, the circumstances surrounding the request for service, and any information gleaned by the physician during performance of the services that would suggest a need to proceed with care in order to avoid injury to the person being examined." *Id.* at 535. The court then proceeded to outline various factors to be considered in determining the nature and extent of the duty. These factors will be discussed, *infra.*

Plaintiffs' second case is *Walters v. Rinker,* 520 N.E.2d 468 (Ind.App.1988). Rinker's family physician referred Rinker to Dr. Hershberger, who found a lump in Rinker's

---

7. The oath is as follows:

I swear by Apollo the physician, by Aesculapius, Hygeia, and Panacea, and I take to witness all the gods, all the goddesses, to keep according to my ability and my judgment the following Oath:

To consider dear to me as my parents him who taught me this art; to live in common with him and if necessary to share my goods with him; to look upon his children as my own brothers, to teach them this art if they so desire without fee or written promise; to impart to my sons and the sons of the master who taught me and the disciples who have enrolled themselves and have agreed to the rules of the profession, but to these alone, the precepts and the instruction. I will prescribe regimen for the good of my patients according to my ability and my judgment and never do harm to anyone. To please no one will I prescribe a deadly drug, nor give advice which may cause his death. Nor will I give a woman a pessary to procure abortion. But I will preserve the purity of my life and my art. I will not cut for stone, even for patients in whom the disease is manifest; I will leave this operation to be performed by practitioners (specialists in this art). In every house where I come I will enter only for the good of my patients, keeping myself far from all intentional ill-doing and all seduction, and especially from the pleasures of love with women or with men, be they free or slaves. All that may come to my knowledge in the exercise of my profession or outside of my profession or in daily commerce with men, which ought not to be spread abroad, I will keep secret and will never reveal. If I keep this oath faithfully, may I enjoy my life and practice my art, respected by all men and in all times; but if I swerve from it or violate it, may the reverse be my lot.

thigh. The lump was surgically removed and sent to Dr. Walters for a pathology examination. Dr. Walters opined malignancy was not present after consulting with some other pathologists. A couple of years later, Rinker was diagnosed with cancer and he sued Dr. Walters for malpractice.

Dr. Walters first contended that no physician-patient relationship existed because he did not examine or treat Rinker. The court rejected this contention on the basis of Indiana statutes which define "malpractice" as any tort or breach of contract based on health care and "health care" as any act or treatment performed by any health care provider.

Dr. Walters then argued that no physician-patient relationship existed because Rinker did not personally seek his assistance. The court also rejected this argument noting, as plaintiffs here point out, that a patient's consent for treatment can be implied when one person contracts with another for the patient's benefit.

The court has difficulty accepting plaintiffs' argument that *Walters* has direct application to this case. The facts obviously are different. Dr. Walters' job as a pathologist was to examine tissues submitted by other physicians who, in turn, relied upon his expertise. If nothing else, it would be contrary to common medical practice to find that a pathologist whose everyday job is not merely to consult with other physicians, but to make independent examinations of tissue samples and render medical judgments thereon, cannot be held responsible for medical negligence merely because the patient from whom the sample was taken did not specifically consult with the pathologist or otherwise formally enter into a physician-patient relationship. Here, in contrast, it is problematic whether any contractual physician-patient relationship arose as the result of defendant's contact with the nurses or Stevens. Defendant's actions are not comparable to Dr. Walters'. The court cannot find that Indiana, much less Kansas, would reach the result in *Walters* based on the facts of this case.

Moreover, the court does not accept plaintiffs' argument that *Walters* supports the existence of a fact question in this case regarding the existence of a physician-patient relationship. The *Walters* court made its rulings as a matter of law. It did not remand the case for trial on the issue of the existence of the physician-patient relationship.

The only Kansas case which says that the existence of a physician-patient relationship presents a question of fact is *Rule v. Cheeseman, Executrix*, 181 Kan. 957, 317 P.2d 472 (1957), which involved the question of whether Dr. Cheeseman was responsible for a sponge left in Rule's stomach during a surgical procedure. The court discussed the operative facts, so to speak, as follows:

> The evidence showed that Doctor Cheeseman, a recognized specialist in surgery, was the first doctor that plaintiff contacted when she began to suffer. Doctor Cheeseman arranged for her entry into the hospital and it should be noted that in addition to what has already been narrated herein from Doctor Harry C. Lapp's deposition, he stated, in substance, that a doctor without hospital connections was unable to get bed care for his patients and a staff member in good standing could get his patients in if there were available beds. Thus it must be a fact that there was a patient-physician, or patient-surgeon relationship between plaintiff and Doctor Cheeseman which continued through such time when the actual operation was commenced and after she was returned to her room. Doctor Cheeseman was the only doctor to visit plaintiff in her room and he came in while still attired in his operating clothes.

> It is admitted that the evidence is somewhat conflicting on what actually took place in the operating room. Plaintiff, who was under anaesthetic, could not testify as to what happened and Doctor Cheeseman is deceased. Doctor Roberts was there and he placed Doctor Cheeseman present in the room as a second assistant in helping to keep the operating field open by using hands or retractors. The two nurses present testified only to the sponge count. Then we have Doctor Weaver's deposition (part of which is relied on by defendant)

where he stated that he *doubted* that Doctor Cheeseman was in the operating room at all times. This testimony cannot be considered as conclusive in the form in which it is stated even from an expert. We cannot agree with the defense or the trial court in their respective theories based solely on Doctor Weaver's testimony that Doctor Cheeseman was not there all the time or that Doctor Cheeseman could have had several operations going on at the same time on none of which would he have been the surgeon. Once Doctor Cheeseman became plaintiff's physician or surgeon (here also a specialist) he remained in that capacity, so far as plaintiff was concerned, as long as he took part in her treatment. This included her pre-operative care, both before and after entering the hospital; his presence with Doctor Weaver during her pre-operative examination in the hospital; his accompanying her into the operating room; during the period of the operation, when he was the only specialist-surgeon present and he acted as second assistant and as supervisor, teacher, advisor, or consultant with authority to take over if something was done wrongly by Doctor Weaver; and during the post-operative care of plaintiff, when he visited her room while still in his operating clothes. Doctor Cheeseman made subsequent visits to the patient at which time she complained of suffering severe pain, a full feeling, and of pressure at one end of the incision but he failed to examine plaintiff and to discover the foreign substance that was later discovered and removed by another surgeon-specialist. In other words, there was not the slightest break in the relationship of patient and surgeon between plaintiff and Doctor Cheeseman during the time when she first saw him in November, 1953, until she contacted Doctor Pollock the following December, as reflected in the record. Plaintiff was entitled to have the question of the existence of the patient-surgeon relationship between her and Doctor Cheeseman submitted to the jury as a fact question. (70 C.J.S., Physicians and Surgeons § 63, pp. 1010, 1011.)

181 Kan. at 964–65, 317 P.2d 472. This court cannot help but wonder whether the Supreme Court, faced with these facts today, would find the existence of a physician-patient relationship as a matter of law.

In any event, the real issue here is not whether a physician-patient relationship existed. There are no disputed issues of material fact about how defendant became involved with Amanda or what he did or did not do. The court will assume for purposes of this order that the facts establish the existence of the relationship, albeit not a traditional one, and turn to the duty issue.

### Defendant's Duty

■ Assuming that a physician-patient relationship existed between plaintiffs and defendant and that a duty arose as a result of that relationship, the question remains as to the nature and scope of that duty. On this crucial question, plaintiffs have cited only one case: *Durflinger v. Artiles*,[8] and contend that defendant's duty is "undisputed." (Doc. 248 at 23.) The court disagrees.

■ Duty of care is a question of law. The duty defined by *Durflinger* and PIK 15.01 is generally applicable to most medical malpractice cases but it is not written in stone. For example, the PIK commentary states that when the medical procedure is universal, the reference to "similar communities" may be deleted. It would be an abdication of judicial responsibility, as well as a waste of judicial time and resources, for the court to blindly allow every malpractice case to go forward without examination of the duty issue when such examination is appropriate. This was made clear by the court in *Greenberg*:

> We have held repeatedly that whether a legal duty is owed by a particular defendant to a particular plaintiff as well as the

8. 234 Kan. 484, 673 P.2d 86 (1983). *Durflinger* states the general proposition that a physician has a duty to exercise that reasonable degree of learning and skill ordinarily possessed and used by members of his or her profession and of that school of medicine in the community in which the physician practices, or in similar communities and under like circumstances. 234 Kan. at 489–90, 673 P.2d 86; *see also* PIK 15.01.

scope of any such duty are questions of law which a court must determine. *Perreira* [*v. State of Colorado* ], 768 P.2d [1198] at 1208 [Colo. (1989) ]; [*University of Denver v.*] *Whitlock*, 744 P.2d [54] at 57 [Colo. (1987) ]; *Smith v. City and County of Denver*, 726 P.2d 1125, 1127 (Colo.1986).

A court's conclusion as to the existence of a duty is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection." *Whitlock*, 744 P.2d at 57 (quoting W. Page Keeton, et al. Prosser and Keeton on the Law of Torts § 53, at 358 (5th ed. 1984)). Several factors, including the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the harm, and the consequences of placing this burden on the defendant are all relevant to a court's consideration of whether to recognize a duty in a particular case. [*Observatory Corp. v.*] *Daly*, 780 P.2d [462] at 466 [Colo. (1989) ]; *Perreira*, 768 P.2d at 1209; *Whitlock*, 744 P.2d at 57; *Smith*, 726 P.2d at 1127. These factors, however, are not exclusive; a court may consider "any other relevant factors based on the competing individual and social interests implicated by the facts of the case." *Perreira*, 768 P.2d at 1209; accord *Whitlock*, 744 P.2d at 57. Because no one factor is controlling in itself, the question is essentially one of fairness under contemporary standards— that is, would reasonable persons recognize and agree that a duty of care exists. *Whitlock*, 744 P.2d at 57; *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo.1987). Upon finding the existence of a duty, a court must then consider the scope of that duty and define the applicable standard of care against which the defendant's conduct is to be measured. It is then for the finder of fact to determine whether the defendant breached that duty. *Taco Bell*, 744 P.2d at 50.

In the absence of special circumstances, the law does not generally impose upon a person a duty to take action for the benefit of another, even if it is reasonably apparent that such action is necessary to protect the other person from injury. *Perreira*, 768 P.2d at 1208; *Whitlock*, 744 P.2d at 57–58. However, we have recognized that people owe a duty to use reasonable care with regard to their affirmative conduct and that such a duty extends to all who may foreseeably be injured if that conduct is negligently carried out. For example, in *Whitlock* we stated that

> [i]n determining whether a defendant owes a duty to a particular plaintiff, the law has long recognized a distinction between action and a failure to act "that is to say, between active misconduct working positive injury to others [misfeasance] and passive inaction or a failure to take steps to protect them from harm [nonfeasance]." ... "The reason for the distinction may be said to lie in the fact that by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs."

*Whitlock*, 744 P.2d at 57 (quoting W. Page Keeton, et al. Prosser and Keeton on the Law of Torts § 56, at 373 (5th ed. 1984)). 845 P.2d at 536–37.

Plaintiffs, who have the burden to establish the existence of a duty, have not discussed these observations, even though they have relied on other language from the opinion. Nor have they cited any Kansas case, or any other case, which suggests that the observations are not valid. The court believes that the Kansas Supreme Court would agree with the observations. This court certainly does.

█ In order to define the duty, it is first necessary to identify it. This can be done, in part, by looking at the allegations of negligence. Here, plaintiffs claim that defendant was negligent because he did not 1) arrange for Amanda's immediate transfer and 2) inform Amanda's mother of the limitations of Anderson County Hospital. Each of these claims of negligence *presupposes* a corresponding duty.

An additional way of defining a duty may be to consider the opinions of the witness identified by plaintiffs as the person who will

provide necessary expert testimony to establish a breach of the duty, here lawyer-doctor Jeffrey P. Phelan. Mr./Dr. Phelan's report states:

> At 1830, Dr. Anderson [sic], the medical director, arrived in the labor and delivery area. However, Dr. Anderson [sic] did nothing to assist this child even though the baby was demonstrating agonal efforts.
>
> \* \* \* \* \* \*
>
> Dr. Anderson [sic], the medical director/Chief of Staff of Anderson County Hospital, deviated from accepted standards of care when he arrived at the hospital at or around 1830 on 19 May 1991 and made no efforts to provide adequate medical assistance to this severely depressed neonate who was demonstrating agonal efforts.

(Doc. 248 at Ex. C.)

 At his deposition, Mr./Dr. Phelan testified:

Q. Now, what criticism do you have of Dr. Henderson if the things he testified to are true?

MR. FISHER: If you assume they are true.

MR. HONEYMAN: We will do him that courtesy.

Q. You don't even know him, do you?

A. Assuming they are true, and he did testify under oath, the primary purpose for him to be there was because, in the judgment of all the parties present, was that Dr. Stevens was not appropriately taking care of the child, and as a consequence was exposing the child to a greater likelihood of neurological injury, and that is why he was brought in, and that was the primary purpose.

The nurses went up the chain of command, and for that reason—

Q. What is your criticism?

A. He didn't examine. His purpose in coming in was because the nurses and the respiratory therapists identified that

Dr. Stevens was not acting appropriately and that someone needed to come in and get help for this child, and he came in and literally discussed with this person and then left. Did not examine her. Did not assume care. Did not make certain that this child was safe. Allowed this to continue for an additional period of time, and **he should have done something.**[9]

He didn't do it.

Q. Specifically, your criticism is that he should have examined the baby instead of talking to Dr. Stevens about what the clinical condition of the baby was? Is that a criticism you have?

A. **He should have examined and assumed control.**

Q. And he should have assumed control at that point, because Dr. Stevens, in your opinion, was not competent to handle the management of the baby?

A. I think that was clear.

Q. Clear by the fact that she was not capable of interpreting electronic fetal heart monitor tracings?

A. This is after the baby has been delivered.

Q. That's kind of the point, the only—

A. The time he is brought in is after the child is delivered and Dr. Stevens is still giving ongoing care, and he's brought in to assist with the newborn, and he didn't do anything.

Q. What knowledge do you have of Dr. Stevens' ability or competence with respect to taking care of newborns with the aid of the respiratory therapist?

A. The purpose of him coming in?

Q. No. If you will answer my question we will get through here quickly.

What knowledge do you have of Dr. Stevens' incompetence or abilities in connection with the caring of a newborn with the aid of a respiratory therapist?

**9.** An opinion that a physician should have "done something" establishes neither a legal duty nor a breach of duty. It has long been Kansas law in products liability cases that negligence is not proven merely because someone demonstrates that there would have been a better way. *Garst*

*v. General Motors,* 207 Kan. 2, 21, 484 P.2d 47 (1971). There is an obvious parallel between an engineering opinion that "something better could have been designed" and a medical opinion that "something" should have been done.

948

What knowledge do you have about that?

A. About his abilities? He's in charge of the respiratory therapy department.

(Doc. 248, Phelan Dep. at 198–200) (emphasis supplied).

■ For purposes of discussion, the court will assume that it should consider Mr./Dr. Phelan's report and testimony on the legal question of duty.[10] He opines that defendant should have "assisted" and "examined" Amanda. What assistance did defendant have a duty to render when Stevens requested none? What examination did defendant have a duty to conduct in view of his recommendation to Stevens that Amanda be transferred? These questions have not been answered. Plaintiffs do not claim that defendant's recommendation for transfer was negligent.

■ The peanut, of course, is Mr./Dr. Phelan's opinion that defendant should have "assumed control" and presumably arranged for Amanda's immediate transfer.[11] Given the undisputed fact that Stevens was the treating physician, the only inference which may be drawn from plaintiffs' claims and Mr./Dr. Phelan's testimony is that defendant should have pushed Stevens out of the way, literally or figuratively, and ordered Amanda's transfer over Stevens' objection. Plaintiffs have offered no foundation upon which Mr./Dr. Phelan could give such an opinion

10. The court rejects plaintiffs' argument that Mr./Dr. Phelan's testimony presents a jury issue. Once a physician-patient relationship is established, it is up to the court to define the duty. Mr./Dr. Phelan's testimony is for a jury only if the court determines the existence of a duty.

11. In their memorandum, plaintiffs claim that Carl V. Smith, M.D., "stated that defendant Henderson failed to transfer Amanda to a tertiary care center and failed to provide proper resuscitation." (Doc. 248 at 30–31.) Neither Dr. Smith's report, nor the excerpts of his deposition, even mention defendant. (Doc. 248 at Ex. J.)

12. This is an exception to the rule that the court cannot consider a witness' credibility at the summary judgment stage. If the court must rely on the testimony of witnesses to determine the nature and extent of a duty, it is obligated to consider credibility.

and the court is not required to assume one. But even if a foundation is assumed and the court further assumes Mr./Dr. Phelan is a credible witness,[12] his opinion is but one factor which the court must consider in determining the duty issue. *Greenberg*, 845 P.2d at 536.

Applying the *Greenberg* factors, this court is not persuaded by Mr./Dr. Phelan's opinion that defendant had a duty to "assume control" of Amanda's care and order her immediate transfer.[13] The court finds that no reasonable person, applying contemporary standards, would recognize and agree that a physician has, or should have, a legal duty to unilaterally and perhaps forcibly override the medical judgment of another physician, particularly a treating physician.[14] The list of adverse consequences to the medical community and to patients is obvious and endless and need not be elaborated upon. The result would be medical, and ultimately legal, chaos. Plaintiffs' failure to cite a case which holds that such a duty exists only serves to confirm this conclusion.

Accordingly, the court concludes, as a matter of law, that defendant had no legal duty to "take charge" of Amanda's care and arrange for her immediate transfer to another hospital.

■ The court also concludes, as a matter of law, that defendant had no duty to

13. The court is reminded of White House Chief of Staff Alexander Haig's declaration, made when President Reagan was shot, that he was "in command," notwithstanding his lack of authority under the Constitution to assume such a role.

14. Kansas recognizes by statute the primacy of the treating physician:

Any health care provider may in good faith render emergency care or assistance during an emergency which occurs within a hospital or elsewhere, with or without compensation, until such time as the physician employed by the patient or by the patient's family or by guardian assumes responsibility for such patient's professional care. The health care provider rendering such emergency care shall not be held liable for any civil damages other than damages occasioned by negligence.

Kan.Stat.Ann. § 65–2891(c). In this case, of course, Stevens was plaintiffs' treating physician throughout.

inform Amanda's mother of the limitations of Anderson County Hospital. Plaintiffs have cited no case which so holds. Neither Mr./Dr. Phelan's report or his deposition excerpts support such a claim but because plaintiff has alleged the claim, the court again will assume that Mr./Dr. Phelan is prepared to testify in support of it.

Defendant's duty arising from the *assumed* physician-patient relationship was limited to the service defendant undertook to perform for plaintiffs, i.e., to exercise reasonable care in giving his medical opinion to Stevens regarding Amanda's transfer. Defendant discharged this duty by making the recommendation to transfer Amanda to another facility, advice with which plaintiffs find no fault. Applying the *Greenberg* factors, the court concludes that no reasonable person would recognize and agree that defendant had a further duty to tell Amanda's mother that he disagreed with Stevens' treatment of Amanda and that he had recommended that Amanda be transferred to another hospital because of inadequate facilities at Anderson County Hospital.

*Defendant's Administrative Responsibilities*

This leaves plaintiffs' alternative theory: that even if no physician-patient relationship existed, defendant's position as chief of staff and his other administrative positions created a duty to intervene in Stevens' care of Amanda and to have prevented Stevens from having obstetrical privileges at the hospital prior to May 19, 1991.

 In May 1991, defendant acted as the chief of staff of the medical staff, the obstetrical department and the emergency room. Plaintiffs argue that hospital documents describing defendant's responsibilities in those positions show he personally undertook duties owed by the hospital to plaintiffs.

Plaintiffs rely upon Restatement (Second) of Torts § 324A,[15] adopted as law in Kansas, which states that one who undertakes to render services to another, either gratuitously or for consideration, which should be recognized as necessary for the protection of a third person, has a duty to act reasonably in the performance of those services. *See P.W. and R.W. v. Kansas Dept. of Social and Rehabilitation Services*, 255 Kan. 827, 833, 877 P.2d 430 (1994). The threshold requirement for the application of § 324A requires the court to focus on the nature and scope of the duties undertaken; in this case, defendant's duties to the hospital. The extent of the undertaking defines the scope of the duty and a defendant cannot be held liable for the negligent performance of a task which he or she did not agree to assume. *See McGee v. Chalfant*, 248 Kan. 434, 442, 806 P.2d 980 (1991).

At the outset, the court rejects plaintiffs' argument that issues of material fact exist with respect to defendant's duties. As explained, *infra*, the duties cited by plaintiffs are established and defined in written documents. Plaintiffs do not contend that the documents are ambiguous and the court would reject such a contention in any event.

No issue of material fact is created by testimony such as that of Richard Brummel, a former member of the hospital's board of trustees. (Doc. 248 at Ex. Q.) Brummel's "expectations" of defendant, (Doc. 248 at 13), are neither relevant nor material because defendant's duties were defined by the documents. The same conclusion applies to the testimony of other trustees regarding their "understanding" of or "opinion" about defendant's duties. (Doc. 248, Rusk Dep. at Ex. N.; Bailey Dep. at Ex. O; Bodenhamer Dep. at Ex. P.) As trustee, Jantz answered on numerous occasions that defendant's duties

---

15. Section 324A provides:
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
 (a) his failure to exercise reasonable care increases the risk of such harm, or

 (b) he has undertaken to perform a duty owed by the other to the third person, or
 (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
 Plaintiffs have not identified which of the alternative subsections on which they rely.

**950**

were defined in the by-laws. (Doc. 248 at Ex. M.) [16]

Finally, no issue of material fact is created by opinions such as those of purported expert William Nellis (Doc. 248 at 19, Ex. R) who, without pointing to any provision in the hospital documents, advances the proposition that the hospital or the hospital staff should have "supervised" Stevens. Once again, defendant's duties were established in written documents which this court is obligated to construe. Expert testimony regarding the interpretation of a document is not admissible unless the document is ambiguous. *Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d 357, 365 (7th Cir.1990).

Plaintiffs cite to the following provisions in the hospital bylaws as creating a duty on the part of defendant to intervene in Amanda's treatment:

**2.5 BASIC RESPONSIBILITIES OF MEDICAL STAFF MEMBERSHIP**

Except for the honorary staff, the ongoing responsibilities of each member of the medical staff includes:

. . . .

(h) working cooperatively with members, nurses, hospital administration and others so as not to adversely affect patient care;

. . . .

**2.6 DUTIES OF OFFICERS**

**6.2–1 CHIEF OF STAFF**

The Chief of Staff shall serve as the chief officer of the Medical Staff. The duties of the Chief of Staff shall include, but not be limited to:

(a) enforcing the Medical Staff bylaws and rules and regulations, implementing sanctions when indicated, and promoting compliance with procedural safeguards when corrective action has been requested or initiated.

. . . .

**4.5–2 EFFECT OF APPLICATION**

In addition to the matters set forth in section 4.1, by applying for appointment to the Medical Staff each applicant:

. . . .

(h) pledges to provide for continuous quality care for his or her patients,

. . . .

**5.6 EMERGENCY PRIVILEGES**

(a) In the case of an emergency, any member of the medical staff ... *shall be permitted* to do everything reasonably possible to save the life of a patient or to save a patient from serious harm.

. . . .

**7.1 FUNCTIONS OF THE MEDICAL STAFF**

The general functions of the medical staff shall consist of:

. . . .

(h) coordinating patient care provided by the department's members with nursing and ancillary patient care services. . . .

(Doc. 248 at Ex. L; Doc. 237 at Ex. F) (emphasis added).

Defendant also signed his acceptance to the position of chief of staff of the obstetrical department on a document which listed his responsibilities. Plaintiffs highlight the following duties:

1. Coordinates the obstetrical care of the patients of the hospital to ensure the adequacy and appropriateness of the obstetrical services provided to the patients.

2. Develops written bylaws, rules, and regulations which are approved by the governing body.

3. Act[s] as liaison with the attending physicians to ensure the proper writing of obstetrical orders.

(Doc. 248 at Ex. G.) Defendant's duties as chief of staff of the emergency room were identical. (Doc. 275, Jantz Dep. at Ex. 3.)

---

**16.** Jantz is an attorney who recognized that counsel's "would you have expected" questions were not proper. The other trustees are laypersons.

## Duty to Intervene

■ These provisions are clearly inadequate to create a legal obligation for the chief of staff to impose his medical judgments on other physicians and intervene in the treatment of their patients. The court cannot construe the general provisions that all members of the medical staff, not just the chief, have a responsibility to "work cooperatively with other members," provide "continuous quality care for his or her patients" and "coordinat[e] patient care" to mean that defendant had either the right or the duty to intrude upon another physician's patient-physician relationship if he disagreed with the other's proscribed treatment. The emergency provision allows, but does not demand, action for the benefit of a patient. However, it does not impose a duty upon the chief of staff or any other physician, even in an emergency, to override the medical judgment of another treating staff physician.

Section 6.2–1 does not create a duty on the part of defendant to intervene in Stevens' treatment decisions as it applies to the enforcement of the hospital's bylaws, rules, regulations and procedural safeguards. The "shall not be limited to" language cannot be construed to place upon defendant, as chief of staff, the duties advocated by Mr./Dr. Phelan.

Lastly, the chief of staff's duties such as coordinating emergency room and obstetrical department care, developing rules, and ensuring the proper writing of emergency room orders are administrative duties and do not create an obligation to plaintiffs to interfere with or override the judgment of other physicians with which the chief of staff does not agree. The court finds nothing in the bylaws which created a duty on the part of defendant to intervene in Stevens' treatment of Amanda.

## Duty to Police Staff Physicians

Plaintiffs' second argument regarding defendant's duties as chief of staff is that he undertook to ensure that only competent doctors had clinical privileges at the hospital. They claim defendant was negligent in not preventing Stevens from having staff privileges, specifically, for not informing the hospital's board of directors that Stevens did not know how to use a fetal heart monitor.

Once again, plaintiffs point to deposition testimony of several members of the board who stated they thought defendant, as chief of staff, would bring violations of hospital rules and regulations to the attention of the board. (Doc. 248, Ex. N at 11, Ex. O at 14; Ex. P at 13; Ex. Q at 9.) Plaintiffs assert that the board relied upon defendant for information, having no independent source of information to learn of events occurring at the hospital. (Doc. 248, Uncontroverted Fact at ¶ 22b.) Defendant knew that Stevens did not know how to use a fetal heart monitor, but did not recommend to the board of directors that it revoke or suspend Stevens' privileges at the hospital. (Doc. 248, Uncontroverted Fact at ¶ 22e; Henderson Dep. at 110.) However, before defendant's failure can be negligence, there must have been a duty based upon the bylaws.

The hospital's bylaws contain the following procedure for reporting conduct detrimental to a patient's safety or to the delivery of quality patient care at the hospital: Every member of the medical staff is required to report to the chief of staff any direct knowledge that any other member of the staff has acted below the applicable standard of care. (Doc. 248, Ex. L at 47.) The reports are referred to the medical executive committee, which is a special committee created for various duties including initiating corrective measures. (Doc. 248, Ex. L at 37, 47.) The medical executive committee investigates the report, then may take several disciplinary actions itself or *may* recommend to the board of directors the reduction, modification, suspension or revocation of clinical privileges. (Doc. 248, Ex. L at 48–49) (emphasis added). Appointments, denials and revocations of appointments to the medical staff are made only after a recommendation from the *medical executive committee* to the board. (Doc. 248, Ex. L at 13) (emphasis added). The chief of staff represents the views and policies of the medical staff to the board. (Doc. 237 at Ex. F.)

■ Thus, it was to the medical executive committee that reports of substandard care

were directed and the executive committee's function to investigate and initiate corrective measures when a staff member's conduct fell below the applicable standard of care. It was the executive committee's decision whether to recommend to the board of directors that it appoint or revoke a medical staff member's clinical privileges. As chief of staff, defendant functioned as a spokesman to the board for the executive committee, but his position did not impose a duty to give his own recommendations to the board independent from those of the executive committee or to directly inform the board of conduct detrimental to the hospital's patients. If defendant had given his individual recommendation that the board revoke or suspend Stevens' privileges as plaintiffs allege he should have, his recommendation would have been a nullity as the hospital's bylaws required a recommendation from the executive committee before a revocation of clinical privileges.[17]

### Duties Created By Other Memberships

■ Plaintiffs also note that as chief of the medical staff, defendant served as an ex-officio and nonvoting member of the perinatal committee. (Doc. 237, Ex. F at 6.2–1(c).) The perinatal committee was to "evaluate the care of the obstetrical and newborn patients" and make recommendations to the medical staff and administration. (Doc. 248 at Ex. G.) Plaintiffs, however, do not explain how defendant's participation as a nonvoting member of the perinatal committee translates into defendant undertaking a duty to plaintiffs to personally insure that only competent doctors practice at the hospital. The same holds true for plaintiffs' claim regarding defendant's position as chief of the emergency room staff.

17. The record before the court is silent as to what actions, if any, the executive committee took with regard to Stevens prior to May 1991. It does not reveal what the executive committee knew about Stevens' practices or if it ever considered recommending to the board to revoke her privileges prior to May 1991. Plaintiffs do not allege that defendant failed to report a recommendation by the executive committee regarding Stevens.

After plaintiffs filed their lawsuit against Stevens in 1992, the "medical staff committee,"

Plaintiffs cite *Mozingo v. Pitt County Memorial Hospital,* 101 N.C.App. 578, 400 S.E.2d 747 (1991), as a "strikingly similar" case which held that a doctor who contracted with a medical school to provide on-call supervision of interns and residents in a hospital's residency program undertook a duty to the hospital's patients to exercise due care.[18] The North Carolina Supreme Court later affirmed this decision, stressing that "the defendant has *stipulated* that he undertook the duty of on-call supervision—not merely consultation with—the resident physicians...." *Mozingo v. Pitt County Memorial Hospital,* 331 N.C. 182, 192, 415 S.E.2d 341 (1992) (emphasis added). The court finds *Mozingo* factually distinguishable. Stevens had full obstetrical privileges at Anderson County Hospital and Henderson did not agree to supervise her work.

The court concludes defendant's position as chief of staff and other administrative positions did not create a duty to intervene in Amanda's treatment, to directly inform the board of Stevens' inability to use a fetal heart monitor or to recommend to the board that it revoke Stevens' obstetrical privileges at the hospital.

### Defendant's Alternative Arguments

Defendant alternatively moves for summary judgment on the ground that Kan.Stat. Ann. § 65–442(a) barred plaintiffs' claims against him. Kan.Stat.Ann. § 65–442 states:

(a) There shall be no liability on the part of, and no action for damages shall rise against, any duly appointed member of the governing board or the duly appointed member of a committee of the medical staff of a licensed medical care facility *for any act, statement or proceeding undertaken or performed within the scope of the function and within the course of the per-*

which the court assumes refers to the executive committee, recommended that the board *approve* the renewal of Stevens' credentials when they became due for renewal. The board rejected the recommendation and decided to suspend, and later revoke, her obstetrical privileges at the hospital. (Doc. 275, Halsel Dep. at 33.)

18. The court notes with disapproval plaintiffs' failure to cite and discuss the fact that the North Carolina Supreme Court later reviewed this decision and decided the case on different grounds.

*formance of the duties* of such committee of the medical staff if such member acted in good faith and without malice, and the medical staff operates pursuant to written bylaws that have been approved by the governing board of the medical facility. (b) There shall be no liability on the part of and no action for damages shall arise against any licensed medical care facility because of the rendering of or failure to render professional services within such medical care facility by a person licensed to practice medicine and surgery if such person is not an employee or agent of such medical care facility.[19]

(emphasis added).

Plaintiff have responded that Kan.Stat. Ann. § 65–442(a) did not apply because defendant did not act pursuant to the bylaws or in good faith. Plaintiffs also have asked the court to declare Kan.Stat.Ann. § 65–442(a) unconstitutional. (Docs. 275, 276.) Having found no evidence in the bylaws or other documents that defendant's positions of chief of staff in the hospital created a duty to intervene in Amanda's treatment or to prevent Stevens from enjoying staff privileges at the hospital, § 65–442(a) is not activated to exempt defendant from liability. Plaintiffs' claims of negligence due to defendant's inaction simply fall outside the scope of defendant's duties as chief of staff. The court therefore will not proceed to plaintiffs' claim that Kan.Stat.Ann. § 65–442(a) is unconstitutional. The court also finds it unnecessary in light of its ruling to evaluate defendant's argument that plaintiffs failed to present evidence that his alleged negligent acts caused Amanda's injuries.

IT IS ACCORDINGLY ORDERED that defendant Henderson's motion for summary judgment (Doc. 236) is GRANTED. The clerk is directed to enter judgment for defendant and tax costs to plaintiffs.

---

19. In *McVay v. Rich,* 255 Kan. 371, 874 P.2d 641 (1994), the Kansas Supreme Court held that § 65–442(b) gave immunity to a hospital from its alleged negligence in extending staff privileges to an incompetent doctor. The court found that § 442(b) barred the application of the "corporate negligence" doctrine, which would require a hospital to exercise reasonable care in granting staff privileges. 255 Kan. at 374–75, 377, 874 P.2d 641. The court expressly declined to consider whether § 65–442(b) violated the Kansas Constitution. *Id.* at 379–80, 874 P.2d 641.