Stacia Lynn P. Wilson appeals the judgment as a matter of law entered by the Limestone Circuit Court in Wilson's medical-malpractice wrongful-death action against Athens-Limestone Hospital ("the hospital"). We affirm.
 I. Facts and Procedural History
Wilson, individually and as mother and next friend of Starsha L. Wilson, a minor, deceased, brought a medical-malpractice wrongful-death action against the hospital and Dr. Bibi L. Teng, who was at the time a pediatrician employed by the hospital, alleging that Dr. Teng wrongfully caused the death of her four-year-old daughter, Starsha Wilson, by not providing proper care while Starsha was a patient in the emergency room of the hospital and by allowing her to be discharged when she still needed medical care. This is the fourth time this case has been before us. The Limestone Circuit Court initially entered a summary judgment in favor of Dr. Teng. Wilson appealed, and, inWilson v. Teng, 786 So.2d 485 (Ala. 2000), we reversed the summary judgment. On August 5, 2002, Wilson voluntarily dismissed her claims against Dr. Teng, without prejudice, electing to go forward with her claims against the hospital. The hospital petitioned for a writ of mandamus ordering the trial court to vacate its order severing the hospital's third-party indemnity claim against Dr. Teng from Wilson's medical-malpractice wrongful-death claims against the hospital. We issued the writ of mandamus. Ex parte Athens-Limestone Hosp., 858 So.2d 960 (Ala. 2003). Finally, the trial court entered a summary judgment on all of Wilson's claims, except her claim against the hospital for vicarious liability based on Dr. Teng's alleged acts or omissions. In Wilson v. Athens-Limestone Hospital (No. 1020262, May 16, 2003), 883 So.2d 272 (Ala. 2003) (table), we affirmed the summary judgment, without opinion. Thus, the plaintiff's only remaining claim was her claim that the hospital is vicariously liable for the alleged acts or omissions of Dr. Teng. At the close of Wilson's case, the hospital moved for a judgment as a matter of law ("JML"). The trial court granted the motion and entered a JML for the hospital. Wilson appeals. *Page 632 
The record reveals the following facts: Starsha was diagnosed with sickle-cell anemia when she was approximately 14 months old. Dr. Teng first treated Starsha several months after she was diagnosed and some time thereafter she became Starsha's regular pediatrician. Dr. Teng had instructed Wilson to take Starsha to the emergency room of the hospital and to telephone Dr. Teng whenever Starsha had a fever of 101 degrees or higher.
On the morning of May 19, 1994, after checking Starsha's temperature and finding that it was 105 degrees, Wilson rushed Starsha to the emergency room, arriving at the emergency room around 6:15 a.m. Upon their arrival, the emergency-room nurses checked Starsha's vital signs, and Dr. Patrick Tucker, an emergency-room doctor at the hospital, performed an initial assessment. Dr. Tucker ordered medication for pain and fever, an IV, blood work, a renal profile, a urinalysis, oxygen, and a chest X-ray.
At 7:00 a.m. Dr. Tucker went off duty, and Dr. Diana Osborn took over in the emergency room. After discussing Starsha's case with Dr. Tucker, Dr. Osborn began providing care to Starsha. Wilson informed Dr. Osborn that Dr. Teng was Starsha's regular pediatrician and that she would like Dr. Teng to come by the emergency room to look at Starsha; however, Dr. Osborn did not contact Dr. Teng.
Shortly after 7:00 a.m., Wilson telephoned Dr. Teng's answering service and requested that Dr. Teng come by the hospital to see Starsha before she went to work that morning. Dr. Teng testified that she did not receive a message from her answering service concerning Starsha on that morning. However, Dr. Teng did visit the hospital that morning, arriving around 9:00 a.m. to see two of her patients who were in the nursery.
Dr. Teng testified that as she was leaving the hospital, she was informed that Starsha was in the emergency room, and she decided to stop by the emergency room on the way out of the hospital. When Dr. Teng arrived at the emergency room, she briefly talked to both Wilson and Starsha. Wilson informed Dr. Teng that Starsha had had a high fever and that she had not urinated despite having drunk several glasses of water. Dr. Teng then told Wilson that she would talk to Dr. Osborn and get back with Wilson before she left the hospital.
After briefly discussing Starsha's case with Dr. Osborn, Dr. Teng returned to speak with Wilson; she told her that "everything looked good" and that Dr. Osborn would take good care of Starsha. Dr. Teng also told Wilson that Starsha had a mild infection but that she would probably be released from the hospital. Dr. Teng testified that she spent approximately 5 to 10 minutes talking to Wilson in the emergency room. Dr. Teng did not take any steps to generate a bill for the time she spent in the emergency room that morning.
Dr. Osborn discharged Starsha from the hospital at 10:50 a.m. that same day. At 12:40 p.m., Starsha returned to the emergency room in an ambulance; she was in full cardiac arrest. Upon being informed of Starsha's condition, Dr. Teng returned to the emergency room. Dr. Teng and Dr. Osborn attempted to resuscitate Starsha, but they were unsuccessful, and Starsha died. The cause of death was a pneumococcal blood infection, a complication of sickle-cell anemia.
Dr. Teng testified that on Starsha's first visit to the emergency room on the day she died Dr. Teng did not have a physician-patient relationship with Starsha. Dr. Teng further testified that it would have been improper for her to take over Starsha's *Page 633 
care from Dr. Osborn because Starsha was an emergency-room patient and Dr. Osborn was the emergency-room physician when Starsha was admitted. Dr. Osborn testified that she was Starsha's doctor on that morning and that all decisions concerning Starsha's care, including the decision to discharge Starsha, were made either by her or by Dr. Tucker.
At trial, several pediatricians testified regarding Dr. Teng's duty to Starsha during Starsha's first visit to the emergency room on the day she died. Dr. David Smalley, a board-certified pediatrician who testified on behalf of the hospital, expressed the opinion that no consultation occurred between Dr. Osborn and Dr. Teng that morning; that there was no physician-patient relationship between Dr. Teng and Starsha during her first visit to the emergency room that day; and that Dr. Teng had no obligation to intervene in Starsha's treatment.
Another pediatrician, Dr. Andrew Melnyk, testified that Dr. Teng did not provide medical care to Starsha on Starsha's first visit to the emergency room on the day she died. However, Dr. Melnyk testified that Dr. Teng did have a physician-patient relationship with Starsha during Starsha's first emergency-room visit and that Dr. Teng "failed in her duties to [Starsha] to see to it that [she] receive the proper care." Dr. Melnyk further testified that the failure to admit Starsha to the hospital for treatment with intravenous antibiotics was a breach of the standard of care.
Dr. Melnyk went on to state that an emergency-room patient is the responsibility of the emergency-room physician, in this case Dr. Osborn. Nevertheless, he testified that Dr. Teng had an "opportunity to intervene in the medical care of [Starsha]" and "failed in exercising that opportunity." In Dr. Melnyk's opinion the decision to discharge Starsha from the hospital put her "in a position of extremely high risk for death."
 II. Analysis
Wilson argues that the trial court erred in granting the hospital's motion for a JML. In reviewing a ruling on a motion for a JML, this Court applies the same standard the trial court used in initially deciding whether to grant or deny the motion.Johnson v. Stewart, 854 So.2d 544, 546 (Ala. 2002). This standard is indistinguishable from our standard of review for a summary judgment. Harrelson v. R.J., 882 So.2d 317, 321 (Ala. 2003). We must determine if the hospital presented substantial evidence, when viewed in the light most favorable to Wilson as the nonmovant, to warrant a jury determination. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v.Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).
Liability for medical malpractice "depends, first, on the existence of a duty to the patient, which, in turn depends on the existence of a physician-patient relationship creating the duty."Wilson v. Teng, 786 So.2d 485, 498-99 (Ala. 2000). In Wilson, we recited the general rule concerning the creation of a physician-patient relationship:
 "`"A physician is under no obligation to engage in practice or to accept professional employment, but when the professional services of a physician are accepted by another person for the purposes of medical or surgical treatment, the relation of physician and patient is created. The relation is a consensual *Page 634 
one wherein the patient knowingly seeks the assistance of a physician and the physician knowingly accepts him as a patient. The relationship between a physician and patient may result from an express or implied contract, either general or special, and the rights and liabilities of the parties thereto are governed by the general law of contract, although the existence of the relation does not need to rest on any express contract between the physician and the person treated. However, the voluntary acceptance of the physician-patient relationship by the affected parties creates a prima facie presumption of a contractual relationship between them. A physician may accept a patient and thereby incur the consequent duties although his services are performed gratuitously or at the solicitation and on the guaranty of a third person."'"
Wilson, 786 So.2d at 499 (quoting Oliver v. Brock,342 So.2d 1, 3-4 (Ala. 1976) (quoting in turn 61 Am.Jur.2d Physicians,Surgeons, and Other Healers § 96 (1972))).[1]
In Wilson, we held that the plaintiff had supplied substantial evidence of the existence of a physician-patient relationship between Dr. Teng and Starsha on the morning of her death. However, the determination that a physician-patient relationship exists does not end the inquiry as to the duty owed. Once a physician-patient relationship is found, the question remains as to the nature and scope of that duty, given the facts of that particular case.
The basis on which the trial court granted the hospital's motion for a JML is unclear.[2] However, this Court can affirm a trial court's judgment for any reason, even one not specifically given by the trial court. Taylor v. Stevenson,820 So.2d 810, 814 (Ala. 2001).
The nature and scope of a duty owed a patient by a health-care provider is a question of law to be decided by the court. SeeWells v. Storey, 792 So.2d 1034 (Ala. 1999) (holding that a hospital and its nurses do not have duty to obtain informed consent independent of physician's duty to obtain consent); Fainv. Smith, 479 So.2d 1150 (Ala. 1985) (holding that a physician has a duty to obtain informed consent). Furthermore, the exact nature and scope of the duty owed the patient in a medical-malpractice action depends upon the facts of each case. Wilson argues that Dr. Teng owed Starsha a duty to intervene in Dr. Osborn's treatment of Starsha. Specifically, Wilson's expert, Dr. Melnyk, testified that Dr. Teng had a duty "to exert whatever influence she could to have [Starsha] treated properly" and that proper treatment "would have been to admit [her] to the hospital for monitoring and for treatment with intravenous antibiotics."
In Dodd-Anderson v. Stevens, 905 F.Supp. 937, 948 (D.Kan. 1995), affirmed, 107 F.3d 20 (10th Cir. 1997), the United States District Court for the District of Kansas decided that, under similar circumstances, a duty did not exist. We find the following rationale from Dodd-Anderson persuasive: *Page 635 
 "[T]his court is not persuaded by [the expert's] opinion that defendant had a duty to `assume control' of [the patient's] care and order her immediate transfer. The court finds that no reasonable person, applying contemporary standards, would recognize and agree that a physician has, or should have, a legal duty to unilaterally and perhaps forcibly override the medical judgment of another physician, particularly a treating physician. The list of adverse consequences to the medical community and to patients is obvious and endless and need not be elaborated upon. The result would be medical, and ultimately legal, chaos. Plaintiffs' failure to cite a case which holds that such a duty exists only serves to confirm this conclusion."
905 F.Supp. at 948 (footnotes omitted).
The plaintiff argues that the facts in Dodd-Anderson are distinguishable from the facts in this case because Dr. Teng and Starsha, unlike the doctor and patient in Dodd-Anderson, had a long-term physician-patient relationship. However, the argument advanced by Wilson and the plaintiff in Dodd-Anderson is the same: that a physician has "a legal duty to unilaterally and perhaps forcibly override the medical judgment of another physician." 905 F.Supp. at 948.
While there are possible factual scenarios where such a duty may exist, the specific facts of this case do not create such a duty. The undisputed facts show that Dr. Teng did not treat or diagnose Starsha during Starsha's first visit to the emergency room on the day Starsha died and did not prescribe any medication or give any medical advice on that first visit. The emergency-room doctors, Dr. Osborn and Dr. Tucker, retained control over Starsha's course of treatment at all times during that first visit. There is no evidence showing that their medical treatment of Starsha was such that Dr. Teng had a duty to override their independent medical judgment. Under these facts, we hold that as a matter of law Dr. Teng did not have a duty to intervene in Starsha's treatment by Dr. Osborn.
 III. Conclusion
For the reasons stated above, we affirm the JML in favor of the hospital.
AFFIRMED.
LYONS, WOODALL, and STUART, JJ., concur.
JOHNSTONE, J., concurs specially.
[1] For a discussion of the physician-patient relationship in the current edition of American Jurisprudence, see 61 Am.Jur.2dPhysicians, Surgeons, and Other Healers § 130 (2002).
[2] The trial judge, responding to the hospital's motion, stated: "I am going to grant the motion. There is no physician/patient relationship established. I think it's unequivocal." However, the written order granting the hospital's motion did not set forth any specific ground for entering the JML.