■ ZIAD AL MALKI et al., Respondents, v KARL H. KRIEGER et al., Appellants. [624 NYS2d 167] —Judgment of the Supreme Court, New York County (Carol E. Huff, J.), entered June 29, 1994, which, upon stipulation consenting to a reduction of damages, awarded plaintiff Ziad Al Malki $4,000,000 for pain and suffering, and order of the same court and Justice, entered March 9, 1994, which, *inter alia,* denied defendants' motions to set aside the verdict, unanimously modified, on the

law and the facts, solely to the extent of vacating the judgment as against defendant Barbara Rackow Gerling and dismissing the complaint as against her, and otherwise affirmed, without costs or disbursements.

On September 15, 1989 plaintiff Ziad Al Malki entered the emergency room at New York Hospital suffering from chest pains. The next evening, upon the advice of defendant Gerling, the attending physician in charge of the coronary care unit, Mr. Al Malki underwent coronary bypass surgery, which was performed by defendant Krieger. Once the surgery was undertaken, Dr. Gerling was, as plaintiff concedes, relegated to the role of a consultant. Although she continued to see the plaintiff daily, Dr. Gerling was not allowed to write specific orders unless there was an emergency. Dr. Krieger, as the attending physician with ultimate authority over plaintiff's care, and his "orange team" had this responsibility.

The heart surgery was successful, except that Mr. Al Malki developed several post-operative complications which culminated in the loss of his esophagus. The explanation for this unusual development was the subject of conflicting expert medical testimony at trial. Mr. Al Malki's first symptoms included breathing difficulties, a fever and unusual agitation and confusion. Plaintiff had a known history of peptic ulcer disease which was recorded throughout the admitting history and the nurses' critical care flow sheets. Dr. Krieger admitted that he did not read the latter, but rather relied on what he was told orally.

Although, the record contains differing explanations for why it was prescribed, Zantac, a medication which suppresses the production of stomach acid, was initially administered to plaintiff after the surgery, then discontinued, and ultimately readministered. According to defendants' witnesses, Zantac is routinely administered to post-operative cardiac patients for one to three days after bypass surgery. In plaintiff's case it was continued until September 25, nine days after the surgery, and then discontinued by an order signed by a hospital resident. Plaintiff's complications continued and an October 1st blood culture to check for the source of his fever revealed the presence of gastrointestinal tract bacteria, which were treated with penicillin. At 10:00 P.M. on October 1st the plaintiff vomited a brown liquid, and by 11:30 P.M. he was complaining of chest pain which was treated with a small dose of morphine and increased oxygen. The next day, plaintiff was reintubated, various x-rays taken and procedures performed.

Dr. Shires, a general surgeon, and his "blue team" examined plaintiff on the night of October 3rd, and concluded that plaintiff had an upper right quadrant abdominal infection. They recommended an exploratory laparotomy, which was performed the next evening. A brownish fluid drawn from the plaintiff's chest contained blood, which Shires attributed to the heart surgery. Zantac and antacids were readministered to the plaintiff starting at midnight on October 3rd. When the laparotomy was performed, Shires discovered pus and inflammation at the lower end of plaintiff's esophagus. After calling in a gastroenterologist to perform an endoscopy, the entire lining of the plaintiff's esophagus was found to be necrotic. Plaintiff's dead esophagus was then removed and he lived on feeding tubes for six months, until April 1990, when his esophagus was reconstructed from a part of his colon. Due to the bypass surgery, the reconstructed esophagus had to be placed just beneath the skin, rather than behind the breastbone and was therefore clearly visible from looking at plaintiff's chest.

This medical malpractice action was premised upon the discontinuation of Zantac during the period of September 25 to October 3, 1989 and the failure to diagnose the problem with plaintiff's esophagus. While there was conflicting expert medical testimony about whether plaintiff's treatment, including the discontinuation of Zantac, was appropriate under the circumstances, and about whether plaintiff's esophagus could have been saved had there been a timely recognition of its deterioration, the jury's assessment of the evidence and subsequent finding of liability against Dr. Krieger and the hospital should not be disturbed because it was neither unsupported by sufficient evidence nor against the weight of the evidence presented. "For a court to conclude that a jury verdict is not supported by sufficient evidence, there must be no valid line of reasoning and permissible inferences * * * which could possibly lead rational people to the conclusion reached by the jury." (Brotman v Biegeleisen, 192 AD2d 410, lv denied 82 NY2d 654.) In this matter, there was ample evidence upon which the jury could rationally conclude that both Dr. Krieger and the hospital were liable for plaintiff's injury. That the defendants' witnesses testified that the defendants had acted properly is simply not a sufficient basis upon which an appellate court may disturb a jury verdict.

However, a review of the record reveals that the defendant Gerling's role during the post-bypass surgery period remained that of a cardiology consultant. The decision to discontinue

Zantac was undertaken by Dr. Krieger's surgery team without input from Dr. Gerling. While it is true that Dr. Gerling had a duty of care as a consultant to advise and make appropriate recommendations to the plaintiff's treating physician, the plaintiff's evidence at trial was devoid of proof that Dr. Gerling in fact breached such duty. Indeed, the testimony of plaintiff's own expert witness, Dr. Sheinbaum, makes clear that his opinion that Dr. Gerling was negligent was based on nothing more than what is conceded to have been an erroneous statement to him by plaintiff's trial counsel that Gerling was a "co-attending" physician. Simply stated, there is insufficient evidence in the record to establish a *prima facie* case against Dr. Gerling, and thus the judgment against her cannot stand.

We are unpersuaded that the damages, as reduced by the trial court from $12,000,000 to $4,000,000, were excessive. While two cases are rarely identical, defendants cannot point to any New York or foreign cases involving a similar injury to the esophagus to support their argument that the verdict, as reduced, was excessive. There are, however, cases from other jurisdictions in which the plaintiff suffered a similar injury to the esophagus and which are instructive to this Court *(see, e.g., Walters v Hitchcock,* 237 Kan 31, 697 P2d 847 [colon interposition surgery to construct bypass esophagus, $2,000,000.00 verdict not excessive]; *Carthen v Jewish Hosp.,* 694 SW2d 787 [Mo] [lost esophagus, $2,500,000.00 verdict not excessive]). Here, the jury's award, as reduced, does not deviate materially from what constitutes reasonable compensation for plaintiff's pain and suffering over a period of approximately 15.9 years (4 years from the date of the October, 1989 esophagectomy in 1989 to the verdict in 1993 and 11.9 years for future damages). As already noted, plaintiff spent six months without an esophagus, connected to feeding tubes, and the reconstructed esophagus is visibly located just under his skin. Additionally, Mr. Al Malki continues to experience great difficulty in eating food, must spend the remainder of his life in an upright position because he lacks an esophageal sphincter to prevent reflux of stomach acid, suffers from chronic bouts of uncontrollable coughing, and has an altered voice.

Finally, defendants' objections on appeal as to the verdict sheet are unpreserved as a matter of law *(Suria v Shiffman,* 67 NY2d 87, 97) and we decline to reach them in the interests of justice. Indeed, not only was there no objection by the defendants to the court's proposed verdict sheet, the interrogatories and instructions concerning the verdict sheet were

formulated in a manner entirely consistent with the specific requests of the defense's trial counsel. While the trial court may have been better advised to heed the plaintiff's initial request for a special verdict, including an apportionment of liability, defendants, having charted their own course on this issue, should not now be heard to complain.

We have reviewed the defendants' remaining contentions and find them to be devoid of merit. Concur—Rubin, J. P., Ross, Asch and Mazzarelli, JJ.