The plaintiff, Stacia Wilson, brought a medical malpractice wrongful-death action against Athens-Limestone Hospital and Dr. Bibi L. Teng, a pediatrician employed by Athens-Limestone Hospital. The plaintiff complains that, after she brought her four-year-old daughter Starsha Wilson to the hospital for treatment for an infection, Dr. Teng, who regularly treated Starsha for sickle-cell anemia, wrongfully caused Starsha's death by causing or allowing her to be discharged without admission to the hospital and without proper care by Dr. Teng. The plaintiff claims that Starsha would not have died had Dr. Teng complied with the applicable standard of care and admitted Starsha to the hospital for treatment. Dr. Teng and Athens-Limestone moved for summary judgment. Finding that no physician-patient relationship existed between Dr. Teng and Starsha, the trial court granted a summary judgment in favor of Dr. Teng, but denied a summary judgment in favor of Athens-Limestone. The plaintiff appeals from the summary judgment in favor of Dr. Teng. We reverse that summary judgment.
On July 2, 1999, the trial court entered the following order:
 "The above-styled matter came before the Court on a Motion for summary Judgment as filed by the Defendant, Dr. Bibi L. Teng. The allegations of the *Page 487 
complaint in the case herein address the treatment rendered to the plaintiff's daughter in the emergency room of Athens-Limestone Hospital on the morning of May 19, 1994. The Defendant, Dr. Bibi L. Teng, is a pediatrician in private practice in Athens, Alabama, and was at the time of this event a salaried employee of the Defendant Hospital. She was not an emergency medicine physician. She did not work any shifts in the emergency department. Athens-Limestone Hospital had its emergency department staffed at all times with subcontractor emergency medicine specialists. The plaintiff's daughter herein, Starsha Wilson, had been a pediatric patient of Dr. Teng in the past. Dr. Teng had serviced the said Starsha Wilson and her disease, sickle cell anemia, both in her office and as her attending physician during prior hospitalizations.
 "With regard to the allegations of this complaint alleging negligence by medical personnel, the child was initially seen at the Athens-Limestone Hospital emergency room by emergency medicine specialist, Dr. J.P. Tucker. Dr. Tucker went off shift at 7:00 a.m. and Dr. Dianna Osborn took over. Dr. Osborn is an emergency medicine physician. On the morning in question, Dr. Osborn made the exclusive treatment decisions for Starsha Wilson in the emergency room. Dr. Osborn made the decision to discharge Starsha Wilson. On the morning in question Dr. Teng, in passing through the emergency department, became aware that Ms. Wilson and Starsha were in the emergency department and visited with them for a short time.
 "The threshold question in this case as to the liability of the said defendant herein is based upon whether or not there was a physician-patient relationship between the child and Dr. Teng on this date. This doctor's involvement with this child must be resolved on a question of fact. No similarly situated pediatric doctor in reviewing anything in regard to this case can speak to the facts of what happened that particular morning. This court has conducted a careful review of those facts in looking at all the evidence before it and particularly with regard to the affidavit and deposition of Dr. Bibi Teng, the deposition of Dr. Dianna Osborn and the deposition of the mother, Stacia Lynn Wilson. Both doctors in question clearly verify that the treating physician this morning for the child was Dr. Dianna Osborn. Dr. Teng testified that she never even went behind the curtain to specifically be with or care for the child. In evaluating the mother's deposition taken May 16, 1997, it is clear that she is not alleging that Dr. Teng undertook any treatment. She further indicated in her testimony that Dr. Teng was only there approximately `three to five minutes' and testified `I guess it really wasn't her case' (Deposition of Wilson, P. 136,7.) She further indicated that Dr. Teng told her, the mother, `Do what the doctor tells you' (Deposition of Wilson, p. 137), referring to Dr. Dianna Osborn. The mother subsequently on August 31, 1998, filed with the Court an affidavit which attempts to create a fact question with regard to the involvement of Dr. Teng. This Court has struck this affidavit and will not consider it because the law will not allow a party to create an issue of fact by providing an affidavit that contradicts, without explanation, her prior deposition testimony. Robinson v. Roberts, 514 So.2d 958 (Ala. 1987). While Dr. Teng had served in the past as this patient's private pediatrician, she was not the child's attending physician in the emergency room on the morning in question and did *Page 488 
not make any medical decision for the administration of any medication or for the discharge of the child from the hospital. All of those medical decisions were made by the attending emergency room physician, Dr. Dianna Osborn. Dr. Teng simply conducted a `social visit' with the family. Dr. Osborn testified that Starsha Wilson was her patient in the emergency room on the morning of May 19, 1994, and the decisions made that day with regard to the appropriate treatment as well as to the discharge were her decisions. She did not consult Dr. Teng to examine or take over the care of the patient or to make any decisions. A physician's liability to a patient is predicated on the existence of a physician-patient relationship. There was no physician-patient relationship between the child and Dr. Bibi Teng during the time period made the subject matter of this complaint.
 "It is, therefore, ORDERED, ADJUDGED, AND DECREED by the Court that summary judgment in favor of the Defendant, Dr. Bibi L. Teng, is hereby granted."
(R. 375-77.) After determining that there was no just reason for delay, the trial court, pursuant to Rule 54(b), Ala.R.Civ.P., declared its summary judgment in favor of Dr. Teng final on August 2, 1999. Asserting that an issue of fact existed as to whether a physician-patient relationship existed between Dr. Teng and Starsha and that the trial court's August 2, 1999, order of summary judgment in favor of Dr. Teng did not comply with Rule 54(b), the plaintiff moved the trial court to alter, amend, or vacate the judgment in favor of Dr. Teng. The trial court denied the motion.
Before ruling on Dr. Teng's motion for a summary judgment, the trial court heard oral arguments from the parties' counsel and considered evidentiary materials submitted by the parties. In her motion for summary judgment, Dr. Teng asserted that she had not rendered any treatment to Starsha on the day of her death and that "no doctor/patient relationship existed between Dr. Teng and Starsha Wilson on the morning of the emergency department visit in question." (Motion, p. 3.) In support of her motion, Dr. Teng submitted her own deposition testimony, the deposition testimony of the emergency room physician Dr. Dianna Osborn, and her own affidavit, in which she stated:
 "On the morning of May 19, 1994, I was in the nursery at Athens-Limestone Hospital attending to two babies. I left the nursery and walked through the emergency department on my way out of the hospital. I had completed my morning hospital rounds and was going to my office to see patients. I did not at that time know that Starsha Wilson was in the emergency department that morning. As I was passing through the emergency department, I was told that Mrs. Wilson and Starsha were there. I stopped briefly to speak to Mrs. Wilson. I looked into the cubicle where Starsha was situated. She was under the care of Dr. Dianna Osborn, an emergency medicine physician. I glanced at the pulse oximeter. I cannot recall the specific numeric value, but I recall that it showed a good level of oxygenation. I spoke briefly with Dr. Osborn at the desk, and I looked briefly at the preliminary lab report on blood work. I did not examine Starsha. I was not consulted by Dr. Osborn. I was not asked to examine or attend to Starsha. Dr. Osborn was in charge of her care. I prescribed no medicine. I was not advised of the details of Starsha's clinical presentation that morning. I did not participate in any way in the decision to discharge Starsha from the emergency department. I did not participate in the *Page 489 
selection of her antibiotic medications. I spoke briefly with Mrs. Wilson as a social visit. I explained the emergency department physician would take care of Starsha. I stayed only a few moments, and I left to go to my office to see patients. I was not present in the hospital when Starsha was discharged. I did not bill the Wilson family for any services on the morning of May 19, 1994, in the emergency department, because I did not render any medical care or treatment. To my knowledge, the hospital did not bill for my services either. The standard of care in the national pediatric community did not (and does not) require me to take over the treatment of a patient under the care of a qualified emergency medicine specialist in the ER who has not consulted me.
 "I was not Starsha's attending physician on the morning of May 19, 1994, in the emergency department at Athens-Limestone Hospital. Starsha was at that time under the care of Dr. Dianna Osborn. Some hours later, on the afternoon of May 19, 1994, I was notified at my office that Starsha was en route back to the hospital in full arrest. I hurried to the hospital and participated in the resuscitative efforts, which were lengthy but unsuccessful. All of the care and treatment rendered by me during the code situation in the afternoon met or exceeded the applicable standard of care for pediatricians in the national medical community."
(R. 171-72.) Likewise, in her deposition, Dr. Teng consistently testifies that her visit to the emergency room was merely a "social visit," during which she did not undertake to examine or treat Starsha.
Opposing the motion for summary judgment of Dr. Teng, the plaintiff claimed that disputed facts exist as to whether a physician-patient relationship existed between Dr. Teng and Starsha. The plaintiff specifically claimed that the facts are disputed as to whether Dr. Teng's visit with the plaintiff in the emergency room was merely a "social visit," as Dr. Teng claims, or whether Dr. Teng's visit was in response to a telephone call she received from the plaintiff on the morning of Starsha's death, as the plaintiff claims. In opposition to the summary-judgment motion, the plaintiff submitted her own deposition testimony of May 16, 1997, and her own affidavit executed on August 27, 1998, in addition to the deposition testimony of Dr. Teng and Nurses Charlotte Inman and Bonnie Livingston, and the affidavits of Dr. Andrew Melnyk (board certified pediatrician), Dr. Alfred Frankel (board certified emergency physician), and Dr. William Maxfield (board certified radiologist). The plaintiff also submitted Starsha's hospital medical records.
In her affidavit, the plaintiff states:
 "At about 6:15 a.m. on Thursday morning May 19, 1994, my sister Tammy Petty who had been babysitting Starsha for me, called me and told me Starsha was not feeling well. I immediately went and took Starsha her pain medication. I gave her two tablespoons of pain medicine (Lortab) which was prescribed by her pediatrician, Dr. Bibi Teng. Starsha began asking for water. I gave her some water and I felt her body, she was very warm and immediately I took her to Athens-Limestone Hospital.
". . . .
 "I went to the waiting room and called Dr. Teng, her nurse took my call and asked what was the problem. I then spoke with Dr. Teng and she said that there was nothing she could do until she consulted with the ER physician. I asked her if she could come to the hospital and check Starsha. She said she *Page 490 
would call the ER for the lab results. I called Dr. Teng because she was Starsha's doctor and had been Starsha's doctor for more than two years and I felt that I could rely on what she said regarding Starsha's condition. I knew that she knew more about Starsha and her condition than the people working in the emergency room.
 "As Dr. Teng normally did when she came to the emergency room to check on Starsha during a crisis, Dr. Teng talked to the ER doctor, came into Starsha's room, checked on Starsha and looked at Starsha's chart herself. Dr. Teng then talked to me about Starsha's condition. She told me that `everything looks good.' She said that the ER physician on call was doing a good job, for me to do everything that she said, and they were going to let Starsha go home. Dr. Teng then talked to the ER doctor before leaving the emergency room. Looking back, Dr. Teng's decision not to admit Starsha somewhat surprised me because I expected Dr. Teng to admit Starsha to the hospital as she had done so many times in the past because I did not think Starsha was well enough to go home. Still, I didn't question Dr. Teng because she was Starsha's pediatrician.
". . . .
 "I have read Dr. Teng's affidavit where she states that she came to the emergency room on a social visit. This claim made by Dr. Teng is not true. I had called Dr. Teng to come to the emergency room and when she saw Starsha and gave me medical advice that was done by Dr. Teng at my request seeking medical advice from my daughter's pediatrician on whom I trusted and relied on."
(R. 228-29.) The trial court found that the plaintiff's affidavit was inconsistent with her deposition testimony, and, therefore, the trial court refused to consider the plaintiff's affidavit as creating an issue of material fact regarding the purpose of Dr. Teng's visit to the emergency room. The only depositions included in the record are those of Dr. Teng and Dr. Osborn. The affidavits of Dr. Melnyk, Dr. Frankel, and Dr. Maxfield are included in the record.
The affidavit of Dr. Melnyk, a board certified pediatrician with over 20 years' experience, describes his review of the autopsy report of Starsha, the hospital medical records of Starsha, and the affidavits of the plaintiff, Dr. Teng, Nurse Inman, Nurse Dollar, and Nurse Livingston, and presents the following opinions and observations:
 "In my opinion, the care and treatment of Starsha Leigh Wilson at Athens-Limestone Hospital for the emergency room visit of 5/19/94 commencing at 6:16 a.m. was below the usual and customary standard of care in that Starsha Leigh Wilson came to the emergency room with a temperature of 104.3 degrees. After treatment with Tylenol, the patient's temperature had gone down to 101.4 degrees. The last recording 10:30 noted temperature to be 101.9 degrees with respiration of 46. Also, the patient was observed to be very drowsy as recorded by C. Inman, R.N., at 8:55. The patient received intravenous fluids but, on catheterization of the bladder at 8:55, only two cc's of fluid were obtained. Bibi Teng, M.D., Starsha's pediatrician, visited the emergency room during this admission less than an hour prior to discharge from the emergency room without further evaluation of the markedly decreased urinary output and with a temperature of 101.9 degrees.
 "There is a factual dispute as to why Dr. Teng appeared at the ER on May 19, of which I am not able to resolve. *Page 491 Assuming that the factual allegations contained in the Mother's affidavit of August 27, 1998, are true, and specifically that the mother's allegation that Dr. Teng undertook to provide Starsha Wilson medical care and treatment by conferring with the emergency room physician regarding the child's condition, reviewing Starsha Wilson's medical charts and advising the child's mother that everything looked fine and that the child would be released shortly, then Dr. Teng would owe a duty to fully assess and treat her patient. If Dr. Teng was in fact at the ER at the request of the mother to treat the child as the mother claims in her affidavit, rather than just casually passing through the ER, the appropriate standard of care would have required that Dr. Teng admit Starsha Wilson, to the hospital for further observation and treatment in view of the clinical condition of the patient with sickle cell disease who was drowsy with a temperature of 101.9 degrees and markedly decreased urinary output. While treating Starsha Wilson with IV fluids, Tylenol and Motrin was appropriate, failure to admit her to the hospital for observation and IV antibiotics and the emergency room physician's sending her home on oral Bactrim was inappropriate and below the minimum standard of medical care."
(R. 217-21.) (Emphasis added.)
On the basis of the same materials reviewed by Dr. Melnyk, Dr. Frankel, an emergency room physician with 30 years of experience in Florida, swears in an affidavit:
 "It is normal, though not required, for a patient's private physician to visit his patient in the emergency room as Dr. Teng did in this case. There is a dispute as to whether Dr. Teng came to the emergency room at the request of the mother or was passing by while making her rounds and dropped in to check on her patient. While not attempting to resolve this matter, it seems clear that Dr. Teng did come to the ER on May 19, 1994, talked to the mother to some extent regarding Starsha's condition, consulted with the ER physician regarding Starsha's condition, reviewed the lab work, and told the mother that everything looked good and that Starsha would be released after rehydration. In my opinion, based on these actions, Dr. Teng undertook to treat Starsha Wilson and thus owed a duty to fully assess and treat her patient, and as the patient presented, to admit the patient to her care."
(R. 234, 238.) (Emphasis added.)
After reviewing the same materials as Drs. Melnyk and Frankel, Dr. Maxfield, an emergency room physician with nearly 40 years of experience, swears in an affidavit:
 "In my opinion, the care and treatment of Starsha Leigh Wilson at Athens-Limestone Hospital for the emergency room visit of 5/19/94 commencing at 6:16 was below the usual and customary standard of care. The care and treatment by the emergency room physician, and Starsha's pediatrician, Bibi Teng, M.D., was below the usual and customary standard of care in that Starsha Leigh Wilson came to the emergency room with a temperature of 104.3 degrees. After treatment with Tylenol, the patient's temperature had gone down to 101.4 degrees. The last recording 10:30 noted temperature to be 101.9 degrees with respiration of 46. Also, the patient was observed to be very drowsy as recorded by C. Inman, R.N. at 8:55. The patient received intravenous fluids but, on catheterization of the bladder at 8:55, only two cc's of fluid were obtained. While some facts are in *Page 492 
dispute, it is undisputed that Bibi Teng, M.D., Starsha's pediatrician, visited the emergency room during this admission less than an hour prior to discharge and did not elect to admit the patient to her service. The patient was discharged from the emergency room by J.P. Tucker, M.D. without further evaluation of the markedly decreased urinary output and with a temperature of 101.9 degrees.
 "There are some standards of care in the practice of medicine that transcend all specialties, including when a physician patient relationship exists, when a physician owes a duty to a patient and conditions that require hospitalization. In my opinion, there existed a physician-patient relationship between Dr. Teng and Starsha Wilson upon Dr. Teng's first visit to the emergency room and Dr. Teng owed an ongoing duty of care to this patient. This doctor-patient relationship is especially true if one assumes that the mother's account of the incident involving the first visit to the hospital on May 19, 1994, is accurate, as she stated in her affidavit that she called Dr. Teng's office and spoke to Dr. Teng about Starsha. Because Dr. Teng appeared personally at the emergency room and visited with the emergency physician, Stacia Wilson, and allegedly looked at Starsha Wilson, there was obviously no need for the emergency room physician to call Dr. Teng to the emergency room for consultation. Dr. Teng undertook to provide Starsha Wilson medical care and treatment by entering into the emergency room, conferring with the emergency room physician regarding her patient's condition, reviewing Starsha Wilson's medical charts and advising the child's mother that everything looked fine and that the child would be released shortly. Such actions by Starsha's private pediatrician of more than two years cannot be realistically assessed as a `social visit' as alleged by Dr. Teng. The appropriate standard of care required that Dr. Teng should have admitted Starsha Wilson to the hospital for further observation and treatment in view of the clinical condition of a patient with sickle cell disease who was drowsy with a temperature of 101.9 degrees and markedly decreased urinary output. Dr. Teng's failure to admit Starsha to the hospital for observation and IV antibiotics and the emergency room physician's sending Starsha home on oral Bactrim was inappropriate and below the minimum standard of medical care."
(R. 208-09.) (Emphasis added.)
In addition to the above-quoted affidavits, the plaintiff also submitted the deposition testimony of Dr. Osborn, the emergency room physician, and the deposition testimony of Dr. Teng. Likewise, Dr. Teng relied upon portions of these depositions in support of her motion for summary judgment. During her deposition, Dr. Osborn responded as follows to questions from the plaintiff's counsel:
 "Q: As an emergency room physician, could you admit patients into Athens-Limestone Hospital?
"A: Just for other physicians.
"Q: What do you mean by just for other physicians?
 "A: I can write the orders, but I don't admit them to my care. They're admitted to another physician's care.
 "Q: And prior to admitting a patient to another physician's care, would you have to talk with that physician?
"A: I typically did.
 "Q: And would the physician who would be caring for the patient have to consent to the admission?
"A: Yes." *Page 493 
(Dr. Osborn's deposition, pp. 30-31.) Dr. Osborn stated that she was aware that Starsha had sickle cell anemia and that she was trained in treating sickle cell patients. She stated also that she was aware that Dr. Teng was Starsha's pediatrician. (Depo., p. 62.) Dr. Osborn continued about her conversation with Dr. Teng on the morning of Starsha's death:
"Q: Do you recall seeing Dr. Teng that morning?
"A: Yes.
". . . .
 "Q: Upon seeing Dr. Teng, did you realize that [she] was Starsha's pediatrician?
"A: Yes.
 "Q: And, of course, you were aware that Dr. Teng was a physician at Athens-Limestone Hospital?
"A: Yes.
 "Q: Tell me the first conversation that you recall having with Dr. Teng in the nursing station.
 "A: I don't remember verbatim. I mean, we talked about the labwork on Starsha and just in general what I was going to do.
 "Q: Do you know whether you had the labwork or the preliminary labwork at that time?
 "A: I know that we had some of it, at least. I'm not sure if I had everything back yet at that time.
 "Q: Do you know whether you gave Dr. Teng the labwork or the charts?
"A: I think I did.
"Q: Why did you do that?
"A: To let her see it.
 "Q: Why would it have been appropriate for Dr. Teng to see the labwork and the chart?
"A: [Starsha] was her patient.
". . . .
"Q: Do you recall specifically what you told Dr. Teng?
"A: No, not specifically.
 "Q: Did you discuss your treatment of Starsha Wilson with Dr. Teng?
"A: Yes.
 "Q: Did you describe how Starsha Wilson presented that morning to Dr. Teng?
"A: I described what I had seen, yes.
 "Q: Did you describe what you had done in response to what you had seen to Dr. Teng?
"A: I'm sorry. I didn't —
 "Q: I'm sorry. Did you describe the treatment that you had given to Dr. Teng?
"A: Yes.
". . . .
 "Q: Did you feel that Dr. Teng would have a better understanding about Starsha's condition seeing that she was Dr. Teng's patient?
 "[Dr. Teng's attorney]: Object to the form of the question. Calls for this doctor to speculate about what might have been in Dr. Teng's mind.
"Q: Just asking your opinion, Doctor.
 "[Dr. Teng's attorney]: I object to it. Calls for speculation about the undisclosed mental operation of another physician.
 "[Attorneys continue to argue about whether testimony is speculative.]
 "[Dr. Teng's attorney to the plaintiff's attorney]: I object to your comments. Now if you want to just let the question sit, I'm happy for this doctor to answer it.
"[Plaintiff's attorney]: That's fine.
"Q: Now, do you remember my question?
"A: No. *Page 494 
 "[Plaintiff's counsel instructs court reporter to read the question.]
 "A: Overall, typically, yes, I assumed that someone who knows the patient better has a better understanding of the patient."
". . . .
 "Q: Do you know how long Dr. Teng was in the emergency room that morning?
"A: No, not exactly.
 "Q: Do you have any judgment as to how long she would have been? Would it have been more than ten minutes, more than fifteen minutes?
"A: Probably somewhere around fifteen, twenty minutes.
 "Q: Do you know whether she saw any patients or had any other patients in the emergency room other than Starsha Wilson?
"A: Not that I recall."
(Depo., pp. 67-89.) (Emphasis added.)
In her deposition, Dr. Osborn also acknowledged that, as the emergency room physician, she did not have the authority to admit patients to the hospital:
 "Q: Dr. Teng stated in her deposition that the emergency room doctor has no admitting privileges?
"A. No, I don't admit patients.
 "Q: She [Dr. Teng] further stated that in order for Starsha to be admitted, she would have had to be consulted?
"A: Yes."
(Depo., pp. 91-92.) (Emphasis added.)
The exchange between the plaintiff's counsel and Dr. Osborn continued:
 "Q: You've already testified that Dr. Teng had the authority to admit Starsha to the hospital; isn't that true?
"A: Yes.
 "Q: And even though you were treating Starsha in the emergency room, Dr. Teng certainly had a right to come in and aid in giving treatment, didn't she? Well, in fact, she did on the second visit [when she attempted to resuscitate Starsha], didn't she?
"A: Yes.
 "Q: And you didn't — as you defined the term consult, you say you didn't consult with Dr. Teng, but it's a fact that you talked to Starsha — to Dr. Teng about Starsha Wilson's condition, didn't you?
"A: Yes.
"Q: And you gave her the chart, didn't you?
"A: As far as I recall.
 "Q: And you told her what you had observed as far as Starsha's condition, didn't you?
"A: Yes.
 "Q: Discussed the preliminary lab reports with her, didn't you?
"A: Yes.
 "Q: And you did all this because, as you stated, that was Dr. Teng's patient — pediatric patient; is that correct?
"A: Yes.
 "Q: And you stated that based on that fact, Dr. Teng would have — you felt that Dr. Teng would have superior knowledge about her condition as it presented; isn't that true?
 "[Dr. Teng's attorney]: Object to the form of the question. It's leading and suggestive.
"[Plaintiff's attorney]: Well, she admitted —
"Q: You admitted to that earlier, though, didn't you?
"[Dr. Teng's attorney]: Don't argue. I'm just asking —
"[Plaintiff's attorney]: I'm sorry. *Page 495 
"A: Yes."
(Depo., pp. 110-12.) (Emphasis added.)
Dr. Teng testified by deposition about her visit to the emergency room and her conversations with the plaintiff and Dr. Osborn as follows:
"Q: What brought you to the emergency room?
 "A: What brought me? First of all, that was my routine way of going through that part to go to the parking lot. The parking lot is just next to it. Our doctor parking lot is next to the ER.
 "Q: So it was just chance that you happened to see Stacia there that morning?
 "A: No sir. I heard — I can't remember. I can't recall. I heard that she was there in the hospital. Just stopped by to say hi to mom.
 "Q: It didn't have anything to do with the fact that Starsha was your patient?
 "A: I don't know how to answer this question. If she's not my patient I probably don't go by for social call."
(Depo., pp. 128-29.) Dr. Teng and the plaintiff's attorney continued in the following exchange:
"Q: Did you see Starsha Wilson on May 19, 1994?
"A: Which time — I mean what time?
"Q: In the morning of May 19th.
"A: I did not — what do you mean by see?
"Q: Visually see.
 "A: Visually, yes. I passed by, talked to mom, saw her. But not — I mean I want to make sure. A lot of times we say I see a doctor today. I just want to clarify it.
"Q: Tell me about your conversation with her mother.
"A: Very brief.
"Q: What did you all discuss?
 "A: I went there, say — usually we just say, what up? I can't remember verbatim, but just a social call, stop by to say hi, see what's going on. And then I went to Dr. Osborn and really brief —
"Q: Who is Dr. Osborn?
"A: The ER physician treating her that morning.
"Q: And you had a brief conversation with him?
"A: With her, yes.
 "Q: I'm sorry, with her. Excuse me. Do you recall what the nature of that or the content of that conversation was?
 "A: Yes. I questioned her about the — not question as in I'm not — just ask her about the IV rate. And she told me the child is a little dehydrated, they just hydrated the kid, she had URI and [was] going to be sent home after hydration.
"Q: What is URI?
"A: Just like a cold.
 "Q: Do you recall whether Ms. Wilson, Starsha's mother, told you that she had tried to call you at your office?
"A: No.
"Q: What was Starsha's condition?
"A: When?
"Q: When you saw her in —
 "A: I did not — she was sleeping quite a few feet away from where I — from where I was talking to the mother.
"Q: Were you in the room?
"A: No.
"Q: Where were you talking to the mother?
 "A: Mama is sitting at the — outside of cubicle with the curtain drawn, maybe two feet opening. She was sitting there.
". . . .
"Q: What did the mother say to you? *Page 496 
 "A: I don't think she say much. I was going there as just a social call. And I look at an IV rate, look at the pulse oximeter, and I just said I talk to the doctor, and I come back to talked to Dr. Osborn. So we don't really have any conversation."
(Depo., pp. 21-25.) (Emphasis added.) Although Dr. Teng could not recall specifically her conversation with the plaintiff-mother, Dr. Teng stated that she told the mother "the lab work looked good; [and] Dr. Osborn will take good care of you." (Depo., p. 122.) Dr. Teng denied that she told the mother that Starsha would soon be released to go home. (Depo., p. 123.)
Dr. Teng testified further that she first treated Starsha in the emergency room of Athens-Limestone in 1991, but she continued thereafter to treat Starsha as her "private patient in her office." (Depo., pp. 35-37.) Dr. Teng acknowledged that she had admitted Starsha to the hospital on prior occasions. She acknowledged also that only she, not the emergency room physician, had the authority to admit Starsha on May 19, 1994. However, she stated that she did not admit Starsha on that day because Dr. Osborn did not consult her to do so. (Depo., pp. 146-47, 156.)
In her appeal, the plaintiff claims that the foregoing evidentiary material created genuine issues of material fact as to whether a physician-patient relationship existed between Dr. Teng and Starsha and whether Dr. Teng breached the standard of care in refusing to admit Starsha to the hospital. The plaintiff also claims that: 1) because the trial court's August 2, 1999, order of summary judgment in favor of the defendant Dr. Teng did not contain a list of factors to support the trial court's finding that there was no just reason for delay, the order did not comply with Rule 54(b), Ala.R.Civ.P.; and 2) the trial court erred in striking her affidavit from the materials she submitted in opposition to Dr. Teng's motion for summary judgment.
 I.
The plaintiff contends that, because the trial court did not explicitly list the factors to support its determination that there was "no just reason for delay" in this case, as required by Brown v. WhitakerContracting Corp., 681 So.2d 226 (Ala.Civ.App. 1996), the trial court's summary judgment in favor of Dr. Teng was not final under Rule 54(b), Ala.R.Civ.P. Recently, on May 26, 2000, this court overruled that requirement of Brown v. Whitaker Contracting, supra, in SchneiderNational Carriers, Inc. v. Tinney, 776 So.2d 753 (Ala. 2000). Footnote 3 of Schneider stated, "Rule 54(b) does not require a trial court to list the factors it considered in finding that there is no just reason for delay." In the case before us the trial court entered a final judgment, specifying that "there is no just reason for delay." (R. 378.) Thus, the trial court fulfilled the requirements of Rule 54(b) and made the summary judgment in favor of Dr. Teng final.
 II.
The plaintiff contends also that the trial court erred in striking her affidavit executed on August 27, 1998. She argues that, although she submitted her affidavit after she gave her deposition testimony on May 16, 1997, her affidavit contains more detailed facts about the events surrounding her daughter's death because she prepared her affidavit from notes she wrote shortly after her daughter's death. She maintains that her affidavit is not inconsistent with her deposition and that, therefore, the trial court should have considered her affidavit in opposition to Dr. Teng's motion for summary judgment. *Page 497 
Attempting to show that the plaintiff's affidavit is inconsistent with her deposition testimony about whether she called Dr. Teng on the morning of Starsha's death, Dr. Teng quotes from the plaintiff's deposition:
 "`Q: Did you yourself call Dr. Teng's office the morning of May 19th?
"`A: Yes.
"`Q: When?
"`A: After a couple of hours later.
"`Q: A couple of hours after being in the ER?
 "`A: Okay. We got there about 5:00 and then I'm going to say about — yeah, I'm going to say about 7:00 because I knew, you know, no one was at her office so at about 7:00, I think sometimes she would get that operator, you know, she would have little voice messages or something and I left a message with the operator and I asked for Dr. Teng to come by to see Starsha because she didn't look good.
"`Q: You spoke with the operator?
"`A: Her nurse or operator. I don't know what she was.
"`Q: Did you dial her office number?
"`A: Yes. And her recording came on.
"`Q: A tape recorder machine?
"`A: It's like an operator. They give her the message.'"
(Dr. Teng's brief, pp. 18-19, citing Stacia Wilson's deposition, pp. 131-32.) In her affidavit, the plaintiff stated that she called Dr. Teng's office from the emergency room on the morning of Starsha's death and spoke with Dr. Teng personally.
The trial found that the plaintiff's affidavit about Dr. Teng's involvement with Starsha on the morning of her discharge contradicted the plaintiff's deposition testimony. Opining that the plaintiff, in her deposition, "is not alleging that Dr. Teng undertook any treatment," the trial court noted that, in her deposition, the plaintiff testified, "I guess it really wasn't [Dr. Teng's] case," and that Dr. Teng's emergency-room visit lasted only "three to five minutes." (Trial Court's Order, C.R. 376.)
This Court has held that "a party is not allowed to directly contradict prior sworn testimony to avoid the entry of a summary judgment."Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313, 317 (Ala. 1992), citing Doe v. Swift, 570 So.2d 1209, 1214 (Ala. 1990). "`When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'"Id., quoting Robinson v. Hank Roberts, Inc., 514 So.2d 958, 961 (Ala. 1987). However, when a party submits a subsequent affidavit merely to clarify his or her answers to ambiguous questions asked by counsel during a deposition or other prior sworn proceeding or to supply information not necessarily sought by questions asked at the deposition or other prior sworn proceeding, the trial court should consider the subsequent affidavit. See, e.g. Rickard v. Shoals Distrib., Inc., 645 So.2d 1378,1382-83 (Ala. 1994); and Tittle v. Alabama Power Co., 570 So.2d 601,606-07 (Ala. 1990).
The plaintiff's deposition testimony, "I guess it really wasn't [Dr. Teng's] case," as quoted by the trial court in its order granting summary judgment in favor of Dr. Teng, is merely a layperson's guess at an opinion on a legal issue rather than a statement of fact. Thus this statement does not foreclose the facts stated in the plaintiff's subsequent affidavit and does not disprove the plaintiff's claim that issues of fact exist as to whether Dr. Teng had a physician-patient relationship and *Page 498 
whether Dr. Teng breached the applicable standard of care. In fact, the portions of the plaintiff's deposition testimony quoted in Dr. Teng's brief are consistent with the plaintiff's affidavit to the effect that the plaintiff did telephone Dr. Teng's office at or about seven o'clock on the fateful morning and that she spoke with someone, whether Dr. Teng herself or her operator, about Starsha's condition and asked that Dr. Teng see her in the emergency room. While the particular portions of the plaintiff's affidavit contradicting the plaintiff's deposition testimony on the topics of the place from which she telephoned Dr. Teng's office, to whom she spoke about Starsha's condition, and how long Dr. Teng's visit to the emergency room lasted, should have been stricken by the trial court, nevertheless the trial court should not have stricken, and should have considered, the remaining portions of the plaintiff's affidavit.
 III.
The plaintiff contends that the trial court erred in granting a summary judgment in favor of Dr. Teng. The plaintiff claims that she presented substantial evidence to create issues of fact as to whether Dr. Teng's preexisting physician-patient relationship with Starsha and Dr. Teng's actions and interactions at the emergency room created a physician-patient relationship and a concomitant duty to Starsha at that time, and whether Dr. Teng breached the standard of medical care for the performance of that duty.
 "A summary judgment should be entered only upon a showing `that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Rule 56(c)(3), Ala.R.Civ.P. `[A] court may not determine the credibility of witnesses on a motion for summary judgment.' Phillips v. Wayne's Pest Control Co., 623 So.2d 1099, 1102 (Ala. 1993). In reviewing a summary judgment, this court is to view the evidence in a light most favorable to the nonmovant and to resolve all reasonable doubts against the movant. Culbreth v. Woodham Plumbing Co., 599 So.2d 1120
(Ala. 1992)."
Ex parte Usrey 777 So.2d 66, 68 (Ala. 2000). "Once the moving party has made a prima facie showing that no genuine issue of material fact exists, the burden of proof shifts to the nonmovant to provide `substantial evidence' in support of his position, so as to show that there is a question of fact." Allen v. Storie,579 So.2d 1316, 1318 (Ala. 1991). To overcome a motion for summary judgment in a medical malpractice action, the nonmovant must present substantial evidence, "that character of admissible evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed." § 6-5-542(5), Ala. Code 1975 (Medical Liability Act of 1987). This Court has held that "[g]enerally, in order to overcome a defendant/physician's motion for summary judgment in a medical malpractice case, the plaintiff must submit competent expert medical testimony to prove that the defendant violated the standard of care set out in [§ 6-5-484, Ala. Code 1975]." Morris v. Young,585 So.2d 1374, 1376 (Ala. 1991), quoting Wozny v. Godsil, 474 So.2d 1078,1080 (Ala. 1985). Section 6-5-484 provides:
 "(a) In performing professional services for a patient, a physician's . . . duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians . . . in the same general line of practice, ordinarily have and exercise in a like case."
Liability for a breach of the standard of care depends, first, on the existence of a duty to the patient, which, in *Page 499 
turn, depends on the existence of a physician-patient relationship creating the duty. In Oliver v. Brock, 342 So.2d 1, 3-4
(Ala. 1976), this Court recited the general rule governing physician-patient relationships as stated in 61 Am.Jur.2d, Physicians,Surgeons, and Other Healers § 96:
 "`A physician is under no obligation to engage in practice or to accept profession employment, but when the professional services of a physician are accepted by another person for the purposes of medical or surgical treatment, the relation of physician and patient is created. The relation is a consensual one wherein the patient knowingly seeks the assistance of a physician and the physician knowingly accepts him as a patient. The relationship between a physician and patient may result from an express or implied contract, either general or special and the rights and liabilities of the parties thereto are governed by the general law of contract, although the existence of the relation does not need to rest on any express contract between the physician and the person treated. However, the voluntary acceptance of the physician-patient relationship by the affected parties creates a prima facie presumption of a contractual relationship between them. A physician may accept a patient and thereby incur the consequent duties although his services are performed gratuitously or at the solicitation and on the guaranty of a third person."
Whether or not a physician-patient relationship exists depends upon the facts in each case. Oliver, 342 So.2d at 4.
Viewing the evidence in the light most favorable to the plaintiff and resolving all reasonable doubts against the defendant, as we must in reviewing a summary judgment for the defendant, this Court finds that the depositions and the affidavits submitted by the parties establish that genuine issues of fact exist as to whether Dr. Teng had a physician-patient relationship with Starsha in Dr. Teng's actions and interactions relating to Starsha in the emergency room on the morning of Starsha's discharge and, if so, whether Dr. Teng breached the applicable standard of care in performing the duty she owed Starsha. The plaintiff's experts supply substantial evidence that the preexisting physician-patient relationship between Dr. Teng and Starsha and Dr. Teng's actions and interactions in the emergency room on the fateful morning created a physician-patient relationship between Dr. Teng and Starsha for that occasion. The same experts supply substantial evidence that Dr. Teng breached the standard of care. The evidence of record supports the factual assumptions grounding the experts' opinions to this effect.
Thus, the trial court erred in granting a summary judgment in favor of Dr. Teng. Consequently, we reverse this summary judgment and remand the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
Maddox, Houston, Lyons, and Brown, JJ., concur.
Cook, J., concurs specially.
See, J., concurs in the judgment and concurs in Parts I and III, but dissents from Part II.
Hooper, C.J., dissents.