*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 19-CV-479 & 19-CV-562

ROBERT CHARLES DOHENY, APPELLANT,

V.

MEDICAL FACULTY ASSOCIATES, INC., APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CAM-2938-18)

(Hon. José M. López, Trial Judge)

(Argued November 12, 2020     Decided November 3, 2022)

*Robert B. Adams* for appellant.

*Edward A. Gonsalves*, with whom *German A. Rodriguez* was on the brief, for appellee.

Before BECKWITH, MCLEESE, and DEAHL, *Associate Judges*.

BECKWITH, *Associate Judge*: Appellant Robert Doheny sued Medical Faculty Associates (MFA) for medical malpractice, alleging that its employee, Dr. Scott Shapiro, acted negligently with respect to Mr. Doheny's wife, Joyce Doheny. The trial court granted summary judgment to MFA on the ground that Dr. Shapiro did

not have a physician-patient relationship with Ms. Doheny and therefore owed her no legal duty.  We reverse and remand for further proceedings.

## I.

In February 2014, Dr. Shapiro, an electrophysiologist, performed a cardiac ablation procedure on Ms. Doheny to treat atrial fibrillation.  Just over two weeks later, Dr. Shapiro saw Ms. Doheny for a routine post-operative follow-up visit, at which Ms. Doheny did not report any symptoms or show any indications of complications.

Eleven days after that follow-up appointment, Ms. Doheny began experiencing stroke-like symptoms and was taken by ambulance to Inova Fairfax Hospital in Virginia.[1]  That evening, at the urging of Mr. Doheny, Dr. Hussain Dhanani—a critical-care specialist who treated Ms. Doheny at Inova—called Dr. Shapiro to inform him that Ms. Doheny was being treated for stroke-like symptoms. Dr. Dhanani testified that it was his "practice to update physicians when . . . the patients are in [his] care" and that he wanted to let Dr. Shapiro "know that the patient was with [him]" and what was happening.  Dr. Dhanani testified that he asked Dr.

---

[1] Dr. Shapiro performed the ablation procedure at George Washington Hospital in the District of Columbia.

Shapiro about the details of the ablation procedure. He told Dr. Shapiro that he thought Ms. Doheny might have had strokes as a result of her atrial fibrillation and "was asking Dr. Shapiro if he had any other ideas about it." During that phone call, Dr. Shapiro did not inform Dr. Dhanani that an atrio-esophageal fistula (AEF) was a rare but serious complication of the ablation procedure Ms. Doheny had recently undergone[2] or that a computed tomography (CT) scan of Ms. Doheny's chest could rule out an AEF. Dr. Shapiro did not recommend any testing or treatment but "agreed with everything [Inova] w[as] doing."

A CT scan of Ms. Doheny's chest was not taken until a week after she was admitted to Inova. In the meantime, she suffered multiple embolic strokes, which left her in a persistent vegetative state. The chest CT scan revealed an AEF, which was diagnosed as the cause of the strokes. Dr. Dhanani testified that he had never heard of AEF before that day.[3] He "immediately called [Dr. Shapiro]" again upon learning the diagnosis to update him and ask if he had seen anything like it. Dr. Shapiro's testimony suggests that he talked with Inova doctors multiple times, but it

---

[2] There is evidence that Dr. Shapiro informed Ms. Doheny that AEF was a possible complication of the ablation at the time of that procedure.

[3] Mr. Doheny has pointed to expert testimony in the record providing that the average emergency room physician or intensivist would not be familiar with AEF.

is not clear whether there were more than these two conversations. Dr. Shapiro also visited Ms. Doheny at Inova, but it is not clear what occurred during that visit.

In 2018, Mr. Doheny filed this action in the Superior Court, individually and as attorney-in-fact for Ms. Doheny.[4] The complaint alleged that Dr. Shapiro acted negligently in failing to alert Dr. Dhanani of the possibility of an AEF or advise him to conduct a CT scan. The trial court granted summary judgment to MFA, concluding that Dr. Shapiro did not owe a legal duty to Ms. Doheny on the night of that initial phone call. This appeal followed.

**II.**

Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Super. Ct. Civ. R. 56(c). We review a grant of summary judgment de novo. *Gilbert v. Miodovnik*, 990 A.2d 983, 987 (D.C. 2010). In doing so, we "analyze the record in the light most favorable to the non-moving party, drawing all reasonable inferences from the evidence in the non-moving party's favor." *Id.* at 988. "[M]ere conclusory allegations by the non-moving party are legally insufficient to avoid the entry of

---

[4] The complaint alleged one count of loss of consortium, which Mr. Doheny brought in his individual capacity, and one count of medical malpractice, which he brought on behalf of his wife as her authorized agent.

summary judgment," however; "a party opposing a motion for summary judgment must produce at least enough evidence to make out a prima facie case in support of his claim." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007).

The first element of a prima facie case of medical malpractice is "the existence of a duty owed by the defendant to the plaintiff." *Gilbert*, 990 A.2d at 988 (quoting *N.O.L. v. District of Columbia*, 674 A.2d 498, 499 n.2 (D.C. 1996)). Whether a duty exists "is determined, in large part, by the nature of the relationship between the parties," and is "ultimately . . . grounded upon policy considerations." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 794, 817 (D.C. 2011). The trial court determined that Dr. Shapiro did not have a duty to Ms. Doheny, and so it did not reach the other elements of a prima facie medical malpractice case: the applicable standard of care, a violation of that standard of care, and a causal connection between the violation and the damage suffered. *Gilbert*, 990 A.2d at 988.

**A.**

The trial court found that no physician-patient relationship existed between Dr. Shapiro and Ms. Doheny at the time of Dr. Dhanani's phone call and granted

summary judgment on that ground.[5]  But "[t]he existence of [a physician-patient] relationship is a question of fact."  *Gilbert*, 990 A.2d at 992 n.10 (alterations in original) (quoting *Hankerson v. Thomas*, 148 A.2d 583, 584 (D.C. 1959)); *see also Irvin v. Smith*, 31 P.3d 934, 940-41 (Kan. 2001) (collecting cases from various jurisdictions providing that "whether a physician-patient relationship exists is generally a question of fact").  Thus, it is a question properly left for the jury unless it is clear as a matter of law.  *See Gilbert*, 990 A.2d at 992 n.10; *see also, e.g.*, *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1034-35 (D.C. 2015).

A physician-patient relationship depends on mutual consent—"the physician's acceptance of the patient and the [patient]'s assent to the medical services."  *Newmyer*, 128 A.3d at 1034 (quoting *Hankerson*, 148 A.2d at 584).  This relationship may be express or implied—it may be established, for example, when a physician "examin[es] [a] patient, independently review[s] or analyz[es] a patient's medical records, engag[es] in a continuous course of treatment, render[s] a medical opinion, or control[s] a patient's course of treatment."  *Id.*  A physician-patient relationship does not require a face-to-face meeting between the patient and

---

[5] The trial court also considered whether Dr. Shapiro might separately have incurred a duty as a consultant to Inova and whether he owed a duty of care to Ms. Doheny because the harm was foreseeable.  Its determination that there was not a duty also rested on public policy considerations.

physician, and may in some circumstances "arise out of a consultation by the patient's primary physician with another physician." *Kelley v. Middle Tenn. Emergency Physicians, P.C.*, 133 S.W.3d 587, 593 (Tenn. 2004) (quoting *Bass v. Barksdale*, 671 S.W.2d 476, 487 (Tenn. Ct. App. 1984)).[6] "As a general rule, unless the services to be rendered are conditioned or limited by notice or by the terms of employment, the physician-patient relationship continues until the services are no longer needed . . . ." *Lyons v. Grether*, 239 S.E.2d 103, 106 (Va. 1977).

The facts here raise a genuine issue as to the existence of an ongoing physician-patient relationship between Dr. Shapiro and Ms. Doheny. There is little doubt that they had a physician-patient relationship for purposes of the ablation procedure. The question is whether that relationship extended to the conversation with Dr. Dhanani. Dr. Dhanani called Dr. Shapiro at Mr. Doheny's request, which a jury could find suggests that from the patient's perspective there was still a physician-patient relationship. Dr. Dhanani asked Dr. Shapiro if he had "ideas"

---

[6] In *Gilbert*, we considered a duty arising out of consultation as a question separate from a duty arising from a "traditional physician-patient relationship." *See* 990 A.2d at 991-92. This does not mean that consultation cannot, under the right circumstances, give rise to a physician-patient relationship. We agree with other courts that in assessing the existence of a physician-patient relationship, a jury may consider whether such a relationship could have been formed through consultation with another physician.

about Ms. Doheny's condition, and, in the light favorable to Mr. Doheny, the fact that Dr. Shapiro "agreed" with what Inova was doing suggests that he weighed in on a course of treatment. Moreover, a jury could find that the preexisting relationship extended to known complications of the ablation procedure, especially those that were outside the ken of the average emergency room physician or critical care provider.[7] *See Gilbert*, 990 A.2d at 993-94 (considering the doctors' relative expertise and ability to handle the patient's situation). Mr. Doheny presented expert testimony that Ms. Doheny was "still [Dr. Shapiro's] patient," and one of MFA's experts agreed that because Ms. Doheny's condition was "a complication of the procedure, she [was] still [Dr. Shapiro's] patient." *See Wilson v. Teng*, 786 So. 2d 485, 499 (Ala. 2000) (finding that expert testimony supplied evidence that there was an ongoing physician-patient relationship). On these facts, a jury could find a physician-patient relationship.

**B.**

While the factual question of the existence of a physician-patient relationship may not always be coextensive with the legal question of duty,[8] a duty of the type at

---

[7] According to expert testimony in this case, symptoms of an AEF would typically show up "[t]wo to four weeks, as long as six weeks" after an ablation.

[8] In *Wilson v. Athens-Limestone Hospital*, for example, the Alabama Supreme

issue here[9] would follow from a finding of a physician-patient relationship. This court has suggested that the duties of non-treating physicians who are consulted about a patient's situation may be limited and will not necessarily extend to a duty to intervene in the patient's care. *See Gilbert*, 990 A.2d at 990 (assuming without deciding that the defendant-physician, who had never met or treated the patient, "had a duty to use reasonable care when conferring with the nurse midwives" who developed the patient's treatment plan but noting that the plaintiff's theory was not based on the defendant-physician's "fail[ure] to identify any material risks of which the [nurse midwives] were not aware").[10] But we have rejected the implication that

---

Court found that the existence of a long-term physician-patient relationship did not, on the facts of the case, give rise to the duty at issue—to intervene in the patient's treatment. 894 So. 2d 630, 634-35 (Ala. 2004).

[9] This court has resisted considering duty in the abstract, instead asking whether there was a duty of a particular type. *See Gilbert*, 990 A.2d at 990 & n.5 (declining to approach the analysis by "hold[ing] that [the defendant-doctor] had an undefined duty of care toward [the patient]" and framing the "crucial question" as "whether [the doctor] had a duty to intervene in the care of [the patient]"). This inquiry in some ways "overlap[s]" with the standard of care, *id.* at 990 n.5, which is a question of fact and therefore ordinarily left for the jury's determination. *See Burke v. Scaggs*, 867 A.2d 213, 219 (D.C. 2005) ("Determining the applicable standard of care is a question of fact for the jury.").

[10] *See also, e.g.*, *In re Sealed Case*, 67 F.3d 965, 969 (D.C. Cir. 1995) ("Even if Mrs. B were correct that her husband and Consultant established a physician-patient relationship, that relationship would only obligate Consultant to exercise 'the degree of care and skill reasonably expected of other medical professionals . . . *acting under similar circumstances*.' . . . Mrs. B does not allege that Consultant . . . failed to inquire into or diagnose any underlying medical problem that he should

there is "no duty for a consulting physician to render appropriate advice simply because the patient is primarily being treated by another" medical provider. *Id.* at 997 n.18. Public policy supports recognizing a duty for physicians who have recently treated a patient to share, rather than withhold, information that could help diagnose that patient's condition if the physician is asked for such information and weighs in on treatment.[11] *Cf. Diggs v. Ariz. Cardiologists*, 8 P.3d 386, 390 (Ariz. Ct. App. 2000) (finding that public policy supported recognizing a duty owed by consulting physician to patient because he was "in a unique position to prevent future harm" to her). Because a jury could find a physician-patient relationship that would give rise to such a duty, summary judgment on the element of duty was not

---

have suspected based on [the six pages of test results he was asked to review]." (quoting *Scarzella v. Saxon*, 436 A.2d 358, 361 (D.C. 1981))); *Dodd-Anderson v. Henderson*, D.C. Nos. 92-1015-MLB, 1997 WL 60743, at *3 (10th Cir. Feb. 13, 1997) ("Even if Dr. Henderson incurred some duty when he responded to the call of the respiratory therapist, it was only a duty to inform Dr. Stevens of his impressions based on his limited knowledge of the patient."); *Al Malki v. Krieger*, 624 N.Y.S.2d 167, 169 (App. Div. 1995) ("Dr. Gerling had a duty of care as a consultant to advise and make appropriate recommendations to the plaintiff's treating physician . . . .").

[11] MFA argues that recognizing a duty here would have negative policy consequences by chilling provider communication, allowing treating physicians to shift responsibility to others, and creating physician-patient relationships without mutual consent. These concerns are overstated, as the duty we recognize here is limited and dependent on factual determinations for the jury. We also note that recognizing a duty does not eliminate any duty on the part of a treating physician, who may still be liable.

appropriate.[12]

## III.

For the foregoing reasons, we reverse the judgment of the Superior Court and remand for further proceedings.

*So ordered.*

---

[12] We do not suggest that a physician-patient relationship is a prerequisite for a finding of duty in all cases.  It remains an open question in this jurisdiction whether there could be a legal duty in the absence of a physician-patient relationship. *Gilbert*, 990 A.2d at 991 n.9.  In this case, the factors that a jury might consider in evaluating the existence of a physician-patient relationship—for example, how much time had passed since the procedure, whether it was foreseeable that the patient would experience complications within that time period, whether those complications could be identified and treated by other medical providers, whether follow-up communication or treatment was ongoing, and how much the doctor was asked for and volunteered information about the patient's condition—would inform whether there was a duty.  But we do not foreclose the possibility that a basis not argued in this appeal could support recognition of a legal duty even if the jury does not find a physician-patient relationship.